## BALTIMORE RADIO SHOW, INC. *v.* STATE
## BALTIMORE BROADCASTING CORPORATION *v.* STATE
## MARYLAND BROADCASTING CO. ET AL. *v.* STATE

[Nos. 170-172, October Term, 1948]

302

*Decided June 9, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*William L. Marbury*, with whom were *John W. T. Webb* and *Marbury, Miller & Evans* on the brief, for the appellant, The Baltimore Radio Show, Inc.

*J. Purdon Wright*, with whom were *W. Frank Every, William Bruce Oswald* and *Paul D. P. Spearman* on the brief, for the appellant, The Baltimore Broadcasting Corporation.

*Hilary W. Gans*, with whom was *Charles Markell, Jr.*, on the brief, for the appellants, The Maryland Broadcasting Co. and James P. Connolly.

*Hall Hammond, Attorney General* and *Harrison L. Winter, Assistant Attorney General*, with whom were *J. Bernard Wells, State's Attorney for Baltimore City, Anselm Sodaro* and *J. Harold Grady, Assistant State's Attorneys*, on the brief, for the appellee.

Briefs of *amici curiae* supporting appellants were filed by *William L. Marbury* for the American Society of Newspaper Editors; *Elisha Hanson, Arthur B. Hanson* and *William K. Van Allen* for the American Newspaper Publishers Association; *Harry N. Baetjer, Venable, Baetjer & Howard, Edwin F. A. Morgan, Frederick W. Brune*, and *Semmes, Bowen & Semmes* for the A. S. Abell Co.; and *Don Petty* for the National Association of Broadcasters.

Briefs of *amici curiae* supporting appellees were filed by *James B. Maginnis, E. Paul Mason, Jr.*, and *J. Nicholas Shriver, Jr.*, for the Junior Bar Association of Baltimore City; *James Lawrence Fly, Joseph I. Paper, John H. Skeen, Jr.*, for the Maryland Civil Liberties Committee, Inc., and the American Civil Liberties Union,

Inc.; and *George Cochran Doub* and *Charles G. Page* for the Bar Association of Baltimore City.

HENDERSON, J., delivered the opinion of the Court.

These three appeals are from separate orders on Jan. 28, 1949, of the Criminal Court of Baltimore City finding the appellants guilty of contempt, and imposing fines, for broadcasting over local radio stations certain news dispatches relating to Eugene H. James, at a time when he was in custody of the police on a charge of murder. We have been greatly assisted in the consideration of the case by the excellent arguments and briefs of counsel on both sides, as well as by the briefs of *amici curiae*.

On the early afternoon of July 6, 1948, Marsha Brill, an eleven year old girl, was stabbed to death by an unidentified man in the northwestern section of Baltimore, while she was at play with two other children. Because of the atrociousness of the crime, great public interest was aroused, and parents residing in the vicinity became greatly concerned for the safety of their children.

At about 10:45 P. M. on the same day, Eugene H. James was arrested and held for investigation. On the afternoon of July 8, 1948, he was taken to the scene of the crime, at which time he made an oral statement to the police admitting his guilt, and directed the police to the spot where he had buried the knife with which the murder was committed. At about 6 P. M., James was formally charged with murder at the Northern Police Station. A few hours later, James signed a written confession. Miss Taggert, the night editor of the United Press, called Hamilton R. Atkinson, Police Commissioner of Baltimore City, about 7 P. M. stating that she intended to write a story embodying the information which he would either give or verify for her. Commissioner Atkinson verified certain information already possessed by her, and gave her certain other information relative to the case. Later that evening, Commissioner Atkinson was interviewed by the Press outside his office at Police Headquarters, and in response to questions, gave further

information, although he denies that he gave out a formal press release for publication.

At about 9:45 P. M. Miss Taggert placed on the teletype, operated by United Press, a dispatch concerning the case. This dispatch was received by the three radio stations and broadcast at various times during the evening, in slightly different forms. The broadcasts were capable of being heard throughout the city and in many of the counties of the State, and were heard by a substantial but indeterminate number of listeners. Similar broadcasts were made by other radio stations located within and without the state, and similar news items were published in newspapers published in Washington, D. C., Philadelphia and New York, circulating in the state. The newspapers published in Baltimore City did not publish the items complained of.

At 8:45 P. M., on July 8, 1948, the appellant Connolly broadcast over the facilities of the appellant WITH the following information:

"After three days of unrelenting hard work on the part of every man in the department, the Baltimore police have just broken the Brill murder case—broken it wide open. Police Commissioner Hamilton R. Atkinson announced only a few moments ago that a man has been arrested and formally charged with the crime—the brutal and apparently pointless stabbing of eleven-year-old Marsha Brill in the Pimlico neighborhood Tuesday afternoon. The funeral of the little murder victim was held today and hundreds of persons attended. *The man now charged with the Brill girl's murder is Eugene James, a 31-year-old Negro and convicted former offender, whose home is at 3311 Payton Avenue, not far from the scene of the crime.*

"*The police said James not only admitted the Brill murder and another recent assault in the same area but that he went over the scene of the crime with them late this afternoon and showed them where the murder weapon was buried. It turned out to be an old kitchen carving knife. Immediately after the finding of the knife*

the prisoner was taken downtown to police headquarters for a formal statement. The story of how James came to be charged with the Brill murder is an account of police work at its best. James was taken into custody yesterday mainly because of his record. Police remembered that he had been charged or suspected in past years with a series of assaults and that about ten years ago he was sentenced to the Maryland Penitentiary for an attack on a ten-year-old child. The police took into account also the fact that James' home was close to the scene of the Brill crime.

"James was questioned, along with other suspects, but no information of much importance was obtained from him until today. The police did not use any force, of course, but questioned him persistently. Then, this morning, according to the officers, James admitted an attack on a white woman recently in the same woods near where the Brill girl was slain. In that case, too, James used a knife but only to threaten his victim into submission. She was not otherwise injured. With more information supplied by James, police recovered the woman's pocketbook, which had been taken from her. Police said James was familiar with every foot of the ground on which offenses, the assault of the woman and the slaying of the girl, occurred. James is not an obvious mental case. Throughout all his questioning, said the police, he seemed, as they put it, 'quite Cute', in other words, wary. When James freely admitted the assault on the woman the police were encouraged and renewed their interrogation with renewed vigor. They felt that James had admitted the lesser assault only to throw the police off the main track, and the police felt they were close to a confession in the Brill case. They were in fact.

"A few hours later the prisoner broke again and this time it was the break that broke the Brill case. James admitted that crime also and consented to accompany the police to the scene. On the ground, said the police, he made a more detailed admission. Among those who accompanied him to the scene of the crime were the high-

est ranking officers of the department. They were led by Commissioner Atkinson. With him were Chief Inspector M. Joseph Wallace, Inspector Joseph Itzel, who had directed the examination of James and other suspects, and Capt. Oscar Lusby, the comparatively new commander of the Northern Police District.

"The appearance of the high ranking police officials with an obvious suspect on the scene of the crime soon drew hundreds of idle spectators and for that reason the police did not linger on the ground any longer than necessary. Instead they took James and the evidence they had accumulated downtown to Police headquarters for a formal statement. From headquarters the prisoner was taken to the Northern station. He probably will be arraigned in Northern police court tomorrow.

"The first hint that the police were close to an important break in the Brill case came with word from an officer of rank at headquarters that, while no arrests had yet been made and no charges had been placed, the police felt they had a very good suspect. James was the suspect of course. *At that time he had not confessed the Brill crime, although he had admitted the earlier offense against the woman in the same neighborhood.* Since the break in the case came so late in the day, the police at first were inclined to postpone making the actual charge against James until tomorrow. In view of the intense interest in the case, however, and in view of the alarm and agitation among parents and children in the area in which the crime occurred, Commissioner Atkinson decided to make the charge and the announcement immediately in order to relieve anxiety among the families in the Pimlico area.

"The Police are deserving of the utmost commendation for the comparatively quick break in the case, and the commendation is merited by every man who worked on the assignment, from the highest to the lowest in the department. From the first Commissioner Atkinson personally took charge of the investigation. The hunt for the slayer promised to be a long, hard routine search.

The killer had escaped from the scene despite a wide dragnet thrown around it soon after the alarm. Usually when an arrest is not made on or near the scene such cases develop into long, exhausting investigations that end, usually, only when the police get some favorable break. *In this case the officers made their own break by remembering James' record and taking him in hand promptly.* Had the police not been so alert and so prompt James might have fled the city. With the prisoner in hand, all the rest was accomplished by patient and skilled interrogation. Dozens of suspects were examined and released until the police felt reasonably sure that the lone man remaining in custody was the one they wanted.

"The police are to be congratulated. And it is tragic that all the community can do otherwise is commiserate with the beraved family. Fifteen hundred dollars in reward money has been offered for the arrest and conviction of the Brill slayer, and the distribution of that money among these who have earned it remains to be decided. But, if I am not mistaken, the police do not consider themselves eligible for rewards.

"And now a brief pause. Here is our announcer, Gil Kriegel, again with a message from our sponsor. I'll be with you again in a moment with more news and comments.

"Tonight's development in the Brill case blasts sky high City Councilman Bill Muth's misguided effort to pin the crime directly on the Supreme Bench of Baltimore. As a result of tonight's arrest, the local judiciary stands exonerated of any complicity. In a sweeping condemnation of the Bench Muth yesterday laid the blame for the Brill murder directly at the door of the judiciary. The City Council Vice President assailed the local courts for coddling criminals and accused the jurists of excessive leniency, especially in the cases of first offenders. Muth complained that even old offenders are let off with light sentences or suspended sentences and that it was common talk around the Court House that almost any old first offender can have his first

offense free—that is, that he can get off without any penalty.

"Muth further stated that in cases where more severe penalties are imposed the sentences are reduced almost before the prisoners get their noses inside the penitentiary doors. One thing Muth said was vindicated in a measure. He said he was willing to go out on a limb and bet that, if and when an arrest was made in the Brill case, the prisoner would turn out to be an old offender who had been up before for similar offenses. And, as you know now, that turned out to be the case. *When James, the defendant in the Brill case, was up before for assaulting a ten-year old girl, his sentence was twenty three years. His release recently means, therefore, that he served only about ten years of the original sentence.*"

The information received by the representative of the United Press was teletyped into the office of the appellant WCBM, which is a subscriber of the United Press, and at about 7:45 P. M. to 8:00 P. M. and 8:00 P. M. to 8:02 P. M. on July 8, 1948, there was broadcast over the facilities of the appellant WCBM the following information which had been received from the representative of the United Press:

"8:00 P. M. & 7:45 P. M. July 8, 1948

*"Baltimore * * * Police Commissioner Hamilton Atkinson announced tonight that the killer of little Marsha Brill is now in custody at the Northern District Police Station. Atkinson identifies the man as 31-year-old Eugene James, a negro handyman, who lives at 3311 Payton Avenue. James was recently released from prison after serving eight years for a series of stabbing attacks on women.*

"8:00-8:02 July 8, 1948

*"Commissioner Atkinson says Police broke the case shortly after James was taken to the murder scene this afternoon. According to the Police Department head, the colored man showed detectives exactly how he stabbed the little girl to death on Glen Avenue near Park Heights,*

*and then led them to a spot at Key and Whitney Avenues where he said he buried the murder weapon—a large butcher knife.*

"James, who is unmarried, has been employed at an apartment house and done odd jobs in the Pimlico neighborhood for several months. *He was released last December from the State Penal Farm after serving eight years on a ten-year sentence for a series of stabbing attacks on women in North Baltimore. He was arrested late Tuesday night after Captain Oscar Lusby of the northern district remembered the earlier cases. Commissioner Atkinson says James also has been linked with an attack on a woman last June 15th in the rear of the 47-hundred block Wabash Avenue. The woman told police her assailant wore a string of beads around his neck. Police say James was wearing beads when arrested Tuesday.*

"James' arrest ends one of the biggest manhunts in Baltimore history. Hundreds of Policemen have been combing the woods in the Pimlico section since Tuesday afternoon when Marsha Brill was dragged from her bicycle and slashed to death Tuesday afternoon.

"The Police Commissioner says no formal charges have been placed against James as yet. Says Atkinson: 'We have only an oral statement. We expect to get a written one later tonight and then we will put the formal charges on the docket.'

"Baltimore * * * Eugene James was formally charged with the murder of eleven-year-old Marsha Brill at 7:45 P. M. tonight. James was docketed at Northern Police Station and taken immediately to police headquarters."

Later during the evening of July 8, 1948, Miss Taggert placed on the teletype operated by United Press for the benefit of its subscribers a dispatch summarizing the information which had been given to or verified for Miss Taggert by Commissioner Atkinson. The dispatch in the following form was received at about 9:45 P. M. by

314

the appellants WCBM and WFBR and broadcast by them:

"Baltimore * * * a negro janitor *with a long prison record has been charged with the murder of eleven-year-old Marsha Brill.* The school girl was dragged from her bicycle and stabbed to death last Tuesday afternoon while she and two playmates were on their way home from a picnic.

"*The man charged tonight is 31-year-old Eugene James of 3311 Payton Avenue. James, who is unmarried, has been working as a handyman around a Pimlico apartment house for several months. He was released last September from the State Penal Farm where he had served eight years of a ten-year sentence for stabbing attacks on women in north Baltimore.*

"Police Commissioner Atkinson said James was arrested Tuesday night just a few hours after the brutal murder.

"*Questioned about the arrest, Atkinson said: 'This man had a record. He attacked a 12-year old girl sometime ago. And we picked up anybody we thought would or could have done this thing.'*

"*Atkinson said earlier that Northern District Police broke the case late yesterday afternoon after James was taken to the scene of the crime in the Pimlico section. The man was led through the woods in handcuffs, and when police returned to the station house, they carried a six-inch butcher knife which will be used in evidence.*

"James was charged with the murder at 7:30 o'clock tonight at the Northern Police Station. He also was charged with attacking and robbing a 38-year-old Baltimore housewife in the 47-hundred block of Wabash Avenue. He is accused of taking five dollars from her.

"When the woman reported the attack, she told police her assailant wore a string of beads around his neck. Police say James was wearing beads when arrested Tuesday.

"The negro was viewed in a police line-up yesterday by the attack victim, and also by eight-year-old Alan

Sapperstein and his eleven-year-old sister, Barbara. The Sapperstein children witnessed the savage attack on their playmate, Marsha Brill.

"Police were still questioning James at Headquarters late tonight. Commissioner Atkinson says the man will be arraigned on the murder and rape charges in Northern Police Court at 9 A. M. tomorrow morning.

"Meanwhile, three Washington Detectives are waiting to question him. They have been in Baltimore since Tuesday investigating the parallel between the Brill slaying and a similar one in Washington's Rock Creek Park one week ago last Sunday. In that case, eleven-year-old Carol Bardwell was dragged from her bicycle and slashed to death.

"Atkinson says James denies this crime and contends he has not been in Washington since 1940. The Washington detectives will question him as soon as Baltimore officials are through with him.

"The only clue linking the Baltimore case with the slaying in Washington is an excursion boat badge found in the woods near Pimlico. The badge is a souvenir issued by a Washington Steamerline. It apparently is brand new and was torn from the clothing of someone running through the undergrowth." (The italicized portions of these broadcasts were italicized in the State's bill of particulars to inform the appellants as to the particular words considered as contemptuous.)

On July 9, 1948, James was indicted by the Grand Jury of Baltimore City for the Brill murder, and for the assault and rape of a certain woman some weeks before the Brill murder. At his arraignment on the indictment for murder on July 13, 1948, through counsel, he plead not guilty, and not guilty by reason of insanity. On September 20, 1948, he submitted to trial before the Criminal Court of Baltimore City, without a jury. He was found guilty of murder in the first degree, and after a motion for new trial had been denied by the Supreme Bench of Baltimore City, sentenced to capital punishment. Upon appeal to this court the judgment

was affirmed. *James v. State,* 193 Md. 65 A. 2d 888. The only question argued was the admissibility of the confessions. Citations for contempt were issued July 20, 1948.

At the appellants' trials upon these citations, in addition to the stipulated facts regarding the broadcasts, William H. Murphy, one of the counsel for James, testified that he represented James at the time of his arraignment. He did not seek a removal, but elected to be tried by the Court without a jury. One of his reasons for waiving a jury was that he "felt that, inasmuch as it was common knowledge throughout the city that James had, allegedly, made a confession, and that he had been previously convicted for crimes somewhat similar to his then present indictment, I did not feel that I could have picked a jury that had not been infected, so to speak, by the knowledge of this man's confession and his criminal background". On cross-examination he stated that one of the reasons he elected trial by the court was because of the broadcasting of information about his client's confession and past criminal record, and that he had talked to numerous people who had heard those broadcasts. Another reason was "the nature of the crime", which appeared so unnatural as to suggest insanity. During the trial in September both the oral and written confessions were admitted in evidence, there was extended testimony of five psychiatrists concerning his mental condition, and in the course of the medical testimony his previous convictions and incarceration were brought to the Court's attention.

A preliminary question is raised concerning the authority of Judge Gray, Associate Judge of the Seventh Judicial Circuit, to sit in these cases. His assignment was by Chief Judge Marbury, of this court on Jan. 14, 1949, "under the authority given me by section 18A of Article IV of the Constitution of the State of Maryland and pursuant to the request of the Judges of the Supreme Bench of Baltimore City * * * to sit as a Judge of the Criminal Court of Baltimore City in the

contempt cases now pending in said Court * * *."
(The cases were then particularly designated.) Judges
Niles and Tucker, who issued the citations, thereupon
entered an order referring the cases to Judge Gray.

Section 18A provides, in part, that "the Chief Judge
of the Court of Appeals shall be the administrative head
of the judicial system of the State * * *. He may
* * * designate, to sit as a judge of the Circuit Court
of any county or of any Court or Courts of Baltimore
City, either alone or with one or more other judges, in
any case or for a specified period, any judge of the Court
of Appeals or of any other Circuit Court or of the
Supreme Bench of Baltimore City."

The appellants contend that this provision is inap-
plicable because a citation for constructive contempt
is not a "case". We find no merit in that contention.
It is true that it was held in *Ex parte Sturm*, 1927, 152
Md. 114, 136 A. 312, 51 A. L. R. 356, and *Kelly v. Monte-
bello Park Co.*, 141 Md. 194, 118 A. 600, 604, 28 A. L. R.
33, that, in the absense of express statutory provision,
no appeal would lie in a contempt case, and that the
general provision for appeals from final "judgments in
criminal cases" was inapplicable. In short, the holdings
were that contempt proceedings were *sui generis* and not
criminal cases within the meaning of the appeal statute.
After the decision in the *Sturm* case, the General Assem-
bly passed a statute conferring the right of appeal "in
all such cases". Code, Article 5, section 107, chapter
357, Acts of 1927. When section 18A of Article IV was
adopted and ratified in 1944, one of its chief purposes
was to give flexibility to the Maryland judicial system.
In the instant case, the reason for the assignment was,
of course, to enable a judge who had not participated in
the formulation of a Rule of court to pass upon its validi-
ty. The assignment was thus within the spirit of the
constitutional provision, and we think it was within the
letter as well. The word "case" is broad enough to in-
clude all proceedings where issues are judicially deter-
mined. *Gamble v. State*, 164 Md. 50, 53, 163 A. 859;

*Baltimore v. Ritchie*, 51 Md. 233. The order of Judges Niles and Tucker could add nothing to the authority of Judge Gray, derived from the order of Chief Judge Marbury, nor could it substract from it. It is clear that they could not assign a criminal case to a judge of another circuit. *Brack v. State*, 187 Md. 542, 51 A. 2d 171. But since section 107 provides that cases of constructive contempt shall be tried "before a judge or judges other than the judge issuing the citation", their order did serve the purpose of making their disqualification a matter of record.

The citations, as amplified by the bill of particulars, were declared to be "based upon Rule 904 of the Rules of the Supreme Bench of Baltimore City" and also "upon the general power and authority of the Courts to issue citations for contempts for the protection of a prisoner's rights to a fair trial." Since much of the appellants' fire is directed at Rule 904, we shall first consider it. The Rule reads:

"In connection with any case which may be pending in the Criminal Court of Baltimore, or in connection with any person charged with crime and in the custody of the Police Department of Baltimore City, or other constituted authorities, upon a charge of crime over which the Criminal Court of Baltimore has jurisdiction, whether before or after indictment, any of the following acts shall be subject to punishment as contempt:

"A. The making of photographs of the accused without his consent.

"B. The making of any photograph in violation of Rule 3 hereof.

"C. The issuance by the police authorities, the State's Attorney, counsel for the defense, or any other person having official connection with the case, of any statement relative to the conduct of the accused, statements or admissions made by the accused, or other matter bearing upon the issues to be tried.

"D. The issuance of any statement or forecast as to the future course of action of either the prosecuting au-

thorities or the defense relative to the conduct of the trial.

"E. The publication of any matter which may prevent a fair trial, improperly influence the court or the jury, or tend in any manner to interfere with the administration of justice.

"F. The publication of any matter obtained as a result of a violation of this rule."

The Rule was adopted in 1939 and has not since been modified. Judge Gray, in a careful opinion, held that paragraph E was "too broad under the clear and present danger doctrine," and was "based clearly upon the original federal rule of the doctrine of reasonable tendency". He held, however, that the rule was severable and rested his finding of contempt upon the violation of paragraph F, that is to say, upon the publication of matter obtained from or statements issued by the Police Commissioner, in violation of paragraph C. The appellants contend that paragraph F is also invalid. We think the history and background of the Rule, as developed in the addresses of Judge Niles, *45 Transactions, Maryland State Bar Association,* p. 101 (1940) and Judge Sherbow, *53 Transactions, Maryland State Bar Association,* p. 165 (1948), support the court's conclusion as to the invalidity of paragraph E. But we do not agree that paragraph F can stand under the doctrine of severability. As the appellants argue, a rule that would condemn the publication of statements made by responsible officials, but condone the publication of similar statements from other sources, would be illogical, if not fatally discriminatory. We are not persuaded that the Rule would have been adopted in that limited form. *Cf. Schneider v. Duer,* 170 Md. 326, 184 A. 914, and *Maryland Theatrical Corp. v. Brennan,* 180 Md. 377, 386, 24 A. 2d 911.

Moreover, counsel for the State and counsel representing the Bar Associations concede that the Rule cannot be construed so as to create an offense of a criminal nature, if, indeed, it can alter in any respect the substantive law. They admit that the source of the power to punish

for contempt is inherent in the court, and that the Rule was merely designed as a general warning or declaration of judicial policy. The appellants contend that even when viewed in this light the Rule is objectionable as being in the nature of a censorship. They point to a practice whereby Judges sitting in the Criminal Court have undertaken to advise the press as to whether particular statements would or would not be contemptuous, and suggest that this runs counter to the accepted Maryland principle that the courts are not at liberty to give advisory opinions, except through the medium of declaratory judgments in contested cases. We think there is force in these contentions, but it is sufficient to say that even if the Rule could be sustained as a warning, it could not, standing alone, support the judgments appealed from, which must stand or fall upon the alternative ground set out in the bill of particulars. Cf. *Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U. S. 629, 44 S. Ct. 220, 68 L. Ed. 480. If the decision below was correct on either ground, it must be affirmed. *Helvering v. Gowran*, 302 U. S. 238, 245, 58 S. Ct. 154, 82 L. Ed. 224. Cf. *Rollman v. Rollman*, 175 Md. 379, 2 A. 2d 15.

The appellants do not deny the inherent power of a court to punish for contempt, but they argue that the power has been limited by statute. Code, Article 26, section 4. Chapter 450, Acts of 1853, as amended by Chapter 31, Acts of 1898. This section provides that "the power of the several courts of the State to issue attachments and inflict summary punishments for contempt * * * shall not be construed to extend to any cases except the following:" (The section then sets out seven classes of contempts, none of which in terms cover publications.) In the original Act of 1853, the title described the Act as "declaratory of the law concerning contempts of court." Section 2 of that Act, providing criminal penalties, is now codified as Code, Article 27, section 30. The appellants contend that this statute was intended to limit the inherent power of the courts to

punish summarily for contempt, and that the General Assembly had the constitutional power to do so.

The doctrine that, under the separation of powers, a court cannot be stripped of its inherent power to protect itself or persons in its custody, has been widely recognized in this country. Nelles and King, "Contempt by Publication", 28 Col. L. R. 554. We find it unnecessary to decide the point, for we think our statute, as construed by this court, is not all-inclusive, despite the argument based upon its contemporary legislative history. In *Ex parte Maulsby*, 1859, 13 Md. 625, Judge Bartol, in an opinion in a *habeas corpus* proceeding (not then reviewable by the Court of Appeals), held that a judgment of contempt was not void, although it did not appear upon its face to have been based on facts within the Act of 1853. He pointed out that contempt "is an offense at the common law; it is not created by the Act of 1853, nor is the jurisdiction to punish it conferred by that Act alone. * * * The Act of 1853 does not confer upon the courts jurisdiction; it is merely declaratory of what shall constitute a contempt; and while it is intended to restrain the courts from punishing, as a contempt, any thing which does not fall within the terms of the Act, it necessarily devolves upon each court which is called upon to enforce it, the power and duty of construing it. * * *"

In *Kelly v. Montebello Park Co.*, 141 Md. 194, 118 A. 600; 28 A. L. R. 33, it was held that the statute authorizing appeals in criminal cases was not broad enough to supplant the common-law rule that no appeal would lie from a judgment in a contempt case. The court referred to the inherent power to punish for contempt, without mentioning the Act of 1853. In *Ex parte Sturm, supra,* 152 Md. 114, 136 A. 312, 314, 51 A. L. R. 356, the court referred to the Act of 1853, but said: "The judicial power to punish for contempt did not emanate from the statute just cited. It is a common-law power possessed, independently of statute, by our courts of constitutional origin." In the case of *In re Lee,* 170 Md. 43, 183 A.

560, 562, decided after the enactment of chapter 357, Acts of 1927, Code Article 5, section 107, establishing appeals on both "the law and the facts" in contempt cases, the court said: "The power and authority possessed by courts may not be destroyed or abridged by legislative enactment. It is recognized as a constitutional attribute, and is preserved as a necessary function of the judiciary."

In *Hitzelberger v. State,* 1938, 173 Md. 435, 439, 196 A. 288, 290, citations were issued upon information that the defendant had attempted to influence a member of the Grand Jury, prior to his arrest and indictment. It was contended that the court was without jurisdiction to punish these acts as contempts because they did not fall within any of the provisions of Code, Article 26, section 4. But the court took the position that the "summary punishments," mentioned in that section, were confined to cases of direct contempt by Code, Article 5, section 107, which prescribed a different procedure in cases of constructive contempt. "There is no need to reconcile these statutes, or to express an opinion of the power of the Legislature in the matter of contempts until presented in a proper case. What we say now is that this is a case of constructive contempt, which the Legislature has not undertaken to construe, define, or forbid. It did, however, prescribe the procedure in cases of constructive contempt, and in doing so merely followed the law as already existing and generally observed." Again in *Freedman v. State,* 1939, 176 Md. 511, 6 A. 2d 249, where the contemnor wrote a letter to the trial judge, in an effort to influence his verdict, the court dealt with the case as one of constructive contempt. We think the *Hitzelberger* and *Freedman* cases are controlling on the question of construction.

The Attorney General makes the further point that the General Assembly has not seen fit to amend these statutes since these cases were decided, so as to repudiate the alleged misconstruction. On the contrary, section 107 of Article 5 was amended by chapter 493 of the

Acts of 1941, merely to provide that, in cases of constructive contempt, trial shall be "before a judge or judges other than the judge issuing the citation."

We come, then, to the chief contention of the appellants, that the power to punish for contempt is limited by the First and Fourteenth Amendments to the Federal Constitution, and that the facts in the case at bar cannot support the judgments, in the light of those amendments, as authoritatively construed by the Supreme Court. It is now perfectly clear that whatever the law of the state, embodied in its constitution, statutes or judicial decisions, the provisions of the Federal Constitution are supreme. *Bridges v. California,* 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192, 159 A. L. R. 1346. It is also clear that the guarantees contained in the First amendment, safeguarding free speech and a free press, are implicit in the concept of due process contained in and made applicable to the States in the Fourteenth amendment. *Gitlow v. New York,* 268 U. S. 652, 45 S. Ct. 625, 69 L. Ed. 1138; *Near v. Minnesota,* 283 U. S. 697, 51 S. Ct. 625, 75 L. Ed. 1357; *Schneider v. State,* 308 U. S. 147, 160, 60 S. Ct. 146, 84 L. Ed. 155. We assume that those guarantees extend to radio broadcasts. *United States v. Paramount Pictures,* 334 U. S. 131, 68 S. Ct. 915, 92 L. Ed. 1260.

In *Bridges v. California, supra,* 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192, 159 A. L. R. 1346, the Supreme Court was squarely faced with the problem of conflict between free speech and a fair trial. It referred to the earlier case of *Nye v. United States,* 313 U. S. 33, 61 S. Ct. 810, 85 L. Ed. 1172, in which the case of *Toledo Newspaper Co. v. United States,* 247 U. S. 402, 38 S. Ct. 560, 62 L. Ed. 1186, was disapproved. It applied the test laid down in *Schenck v. United States,* 249 U. S. 47, 52, 39 S. Ct. 247, 249, 63 L. Ed. 470, whether or not "the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils". "What finally emerges from the 'clear and present danger' cases

is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." [314 U. S. 252, 62 S. Ct. 194] Pressed with the argument that the power to punish for contempt was deeply rooted in the English common law, the court said: "The First Amendment cannot reasonably be taken as approving prevalent English practices. On the contrary, the only conclusion supported by history is that the unqualified prohibitions laid down by the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society." The court also pointed out that the effect of the publication during the pendency of the trial appeared "to be double: disrespect for the judiciary; and disorderly and unfair administration of justice." Brushing aside the first effect and considering the second, the Court said: "We cannot start with the assumption that publications of the kind here involved actually do threaten to change the nature of legal trials, and that to preserve judicial impartiality, it is necessary for judges to have a contempt power by which they can close all channels of public expression to all matters which touch upon pending cases."

One of the specific statements alleged to have been contemptuous in the Bridges case was an editorial commenting upon a pending prosecution against labor leaders and stating that the judge would make a serious mistake if he put them on probation. As to this the court said: "To regard it * * * as in itself of substantial influence upon the course of justice would be to impute to judges a lack of firmness, wisdom, or honor, which we cannot accept as a major premise." In the companion case, while a motion for new trial was pending, Bridges telegraphed the Secretary of Labor calling the judge's previous decision an outrage and stating that his union did not intend to follow it. This was construed as a threat to strike, if the court did not change its decision.

Despite the powerful dissent of Mr. Justice Frankfurter in that case, in which three justices concurred, the same principle was applied in *Pennekamp v. Florida,* 328 U. S. 331, 66 S. Ct. 1029, 90 L. Ed. 1295 (in which all of the participating Justices concurred) and in *Craig v. Harney,* 331 U. S. 367, 67 S. Ct. 1249, 1255, 91 L. Ed. 1546. In the latter case the court said: "The danger must not be remote or even probable; it must immediately imperil." In that case, as in the *Bridges* case, there were direct threats and attempts to influence the decision of the trial judge in a pending case, not merely unfounded criticism after the event. Mr. Justice Frankfurter filed a dissent in which the Chief Justice concurred. Mr. Justice Jackson filed a separate dissent.

It is trite to observe that we are bound by the decisions of the Supreme Court construing the Fourteenth Amendment. "We are not at liberty to decide to the contrary, or to attempt to whittle away the effect of such decisions by holding that some of the statements made are *dicta.*" *Goetz v. Smith,* 191 Md. 707, 711, 62 A. 2d 602, 603. In the recent cases, the Supreme Court was not concerned with publications merely *"scandalizing"* the trial court, but with publications calculated and designed to influence the court's decision. The judgments were reversed because the court found that the danger that the trial court would be influenced was remote.

It is suggested that the Supreme Court, which has not hesitated to extend the constitutional protection to procedural due process, might take a different view where juries or potential juries are concerned, rather than trial judges. The distinction is hardly tenable. Judges are not so "angelic" as to render them immune to human influences calculated to affect the rest of mankind. Conversely, while juries represent a cross-section of the community, it cannot be denied that in every community there are citizens who by training and character are capable of the same firmness and impartiality as the judiciary. It is plainly a matter of degree. The dissenting opinions argue that neither judges nor juries can

remain unaffected by comments and recriminations while a case is pending. This contention did not prevail, even in cases where the statements threatened the judges with retaliation, if they should reach a particular decision. Granted that the decisions are not directly in point, they seem to go further than we are required to do in the case at bar.

In the case at bar, we are not concerned with deliberate attempts to influence the outcome of a pending case. The statements were not argumentative, but factual. "If there was electricity in the atmosphere, it was generated by the facts", not by the "explicit statement of them". *Bridges v. California, supra,* 314 U. S. at page 278, 62 S. Ct. at page 201, 86 L. Ed. 192, 159 A. L. R. 1346. It was at least a mitigating circumstance that the broadcasts reported statements made or verified by the public authorities. We are asked to hold that disclosure of the fact that the accused had confessed, and had previously been convicted of similar crimes, presented such a clear and present danger as to deprive the accused of his right to a fair trial. It is appropriate to consider, in this connection, the legal effect of such disclosures in the course of a trial.

A confession is inadmissible in evidence until such time as the State can show that it was freely and voluntarily made. During this preliminary examination we have said that it is the better practice to exclude the jury, although we have held that it is not reversible error to deny a motion to exclude the jury, if the court subsequently rules that the confession is admissible. *Smith v. State,* 189 Md. 596, 56 A. 2d 818. The practice of excluding the jury is by no means universal. In many states it is held to be discretionary with the trial judge. *Wigmore, Evidence,* 3d Ed., § 861. In none has it been elevated to the status of a constitutional right. Nor has it ever been suggested that mere public knowledge of a confession would vitiate a subsequent trial. If that were so, after a case had been reversed on appeal, for

the improper admission of a confession, the case could not be retried.

As we pointed out in *James v. State, supra,* the present English practice is to exclude altogether confessions obtained by the police from persons under arrest, implemented by Rules of Court and Instructions to the Police. The practice in this country is quite to the contrary, although in the federal courts the admissibility of a confession is scrutinized more closely, particularly in cases of protracted or illegal detention. Upon the question whether disclosure of a confession is contemptuous, there is not an abundance of American authority, although the instances in which it has been done are legion. *Sullivan, Contempts by Publication,* 2nd Ed. 1940, p. 125. In *Herald-Republican Publishing Co. v. Lewis,* 1913, 42 Utah 188, 129 P. 624, the court reversed a finding of contempt because of rulings by the trial court. Chief Judge McCarty concurred on the ground that there was no showing of actual prejudice to the accused in the publication of the confession.

In trials before court or jury evidence that the accused has been convicted of other crimes, wholly unrelated to the crime charged, is inadmissible. *Wood v. State,* 191 Md. 658, 664, 62 A. 2d 576, 578; *Dobbs v. State,* 148 Md. 34, 129 A. 275. However, such evidence may have logical relevancy, particularly where it tends to establish a behavior pattern. In the case at bar the previous record of the accused was the clue that led to his apprehension by the police. There is also a widely recognized exception to the exclusionary rule in cases involving sex crimes or abnormalties. *Wentz v. State,* 159 Md. 161, 150 A. 278, citing *Wigmore, Evidence,* 3d Ed. § 398. (See also the dissenting opinion of Chief Judge Bond.) The rule that previous convictions are inadmissible is based upon the desirability of avoiding a confusion of issues as well as the unconscious influence upon the trier of the facts. After verdict, it is universal practice for the court to be informed of past offenses in determining the appropriate sentence. *Murphy v. State,* 184 Md. 70,

82, 40 A. 2d 239. Without questioning the soundness of the rule of exclusion prior to verdict, it remains a rule of evidence, not a constitutional right. As bearing upon the issue of insanity, it can hardly be doubted that the psychiatrists would have been permitted to disclose, in a jury trial, the prior offenses and predilections of the accused, as they did without objection in the trial by the court.

The suggestion of prejudice in the broadcast that the accused was "wary" and "not an obvious mental case", can hardly be maintained. These statements fall short of an expression of opinion that the accused was sane, which would be inadmissible from a witness not qualified to express such an opinion.

Assuming that the case at bar was "pending" as soon as the accused was arrested and charged, but before his indictment, *Berlandi v. Commonwealth*, 314 Mass. 424, 50 N. E. 2d 210, 216, it seems clear that the mere fact of public statements as to matters that might, or might not, be admissible in evidence against him, would not prevent a trial or vitiate a subsequent jury verdict. Our decisions so hold. In *Garlitz v. State*, 71 Md. 293, 300, 18 A. 39, 41, 4 L. R. A. 601, a talesman, examined upon his *voir dire*, admitted that he had formed an opinion based upon newspaper reports and rumors, but that it could be changed by the evidence. The court, speaking through Chief Judge Alvey, said: "In our present state of society, all that can be required of a juror, to render him competent, is that he shall be without bias or prejudice for or against the accused, and that his mind is free to hear and impartially consider the evidence, and to render a verdict thereon without regard to any former opinion or impression existing in his mind, formed upon rumor or newspaper reports." *Cf. Lockhart v. State*, 145 Md. 602, 614, 125 A. 829.

In *Downs v. State*, 111 Md. 241, 73 A. 893, 896, 18 Ann. Cas. 786, it was held that the trial court had not abused its discretion in declining to remove a case, although it was undisputed that the newspapers had pub-

lished statements that the accused had confessed. The court said: "Such comment does not always arouse such a general prejudice against the accused as to render it impossible for him to secure a fair trial in the county or city where the crime is committed, and it is for the judge to whom the suggestion is made to determine, on the proofs presented to him, whether such prejudice exists."

In *Newton v. State,* 147 Md. 71, 77, 127 A. 123, 126, three persons were jointly indicted for criminal conspiracy. Two of them elected to be tried by the court without a jury and were convicted. This fact, together with the evidence produced at the trial, was published in the Baltimore newspapers. Newton, who elected a jury trial, filed an affidavit and suggestion of removal, which was denied. On appeal, this court, speaking through Judge Offutt, said: "We cannot assume as a matter of law, as we are asked to do, that either judges or jurors will be influenced by considerations which under their official oaths they are bound to disregard, and the statements made by the jurors in this case tend to confirm that view. * * * Before he was sworn in this case every juror on the panel expressly denied that he would be influenced in rendering his verdict as to Newton by the verdict of the three judges, and stated affirmatively that his verdict would be based solely upon the law and the evidence uninfluenced by the action of the three judges in the case against Gillespie and Dickey".

In *Jones v. State,* 185 Md. 481, 485, 491, 45 A. 2d 350, 351, we held that, upon petition for a change of venue, the trial court should determine the truth or falsity of the facts alleged as to local prejudice. It was not suggested that "statements printed in local and state-wide newspapers alleging confessions and admissions of guilt" would, without more, require removal. In *Holt v. United States,* 218 U. S. 245, 251, 31 S. Ct. 2, 6, 54 L. Ed. 1021, 20 Ann. Cas. 1138, where in a federal case it was contended that members of the jury were influenced by newspaper accounts, published during the trial, Mr.

Justice Holmes, speaking for the court, said: "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day". See also *Welch v. United States*, 77 U. S. App. D. C. 317, 135 F. 2d 465; *certiorari* denied, 319 U. S. 769, 63 S. Ct. 1329, 87 L. Ed. 1718.

An accused, of course, has a right to examine prospective jurors on their *voir dire*. *Alexander v. R. D. Grier & Sons Co.*, 181 Md. 415 30 A. 2d 757; *Whittemore v. State*, 151 Md. 309, 314, 134 A. 322. In a capital case, he has an unqualified right of removal. Code, Article 75, section 109. These rights are predicated upon the ever-present possibility of public indignation and prejudice against an accused, where a crime of a wanton or shocking character is committed. The mere fact of arrest, or indictment, implies that the police believe the accused to be guilty, or that the Grand Jury has found a *prima facie* case. Knowledge that the public authorities are active may have a tendency to allay public excitement and fears, so often magnified by word of mouth. Trials cannot be held in a vacuum, hermetically sealed against rumor and report. If a mere disclosure of the general nature of the evidence relied on would vitiate a subsequent trial, few verdicts could stand.

With due respect for the finding of Judge Gray, we find no direct evidence of prejudice in the community because of the broadcast information. The testimony of James' counsel that he felt the disclosures would prevent him from obtaining an impartial jury, were only conclusions of the witness and not statements of fact. Unless we can infer prejudice from the broadcasts themselves, the State has not met the burden of proof.

The State earnestly contends, however, that the question is not whether there is such a showing of prejudice as to vitiate a trial, but whether the statements were reasonably calculated to influence a potential jury. We should have grave difficulty in holding that the same statements that would not be so prejudicial as to require

the reversal of a death sentence, could still be so prejudi-
cial as to support convictions for contempt. But even
drawing the inference, we think the proof does not meet
the present test laid down by the Supreme Court, which
requires more than an inherent or reasonable tendency to
prejudice, or even the probability that it will do so.

In so holding, we are well aware of the high motives
of the Maryland Bench and Bar in attempting to keep
the stream of justice undefiled by sensationalism, and
the dramatization of crime, so prevalent in this country
and so roundly condemned in England. We do not sug-
gest that the courts lack the traditional power to disci-
pline officials who are a part of the administration of
justice. The question whether they can now deal with
the radio stations or the press in cases where the state-
ments are inflammatory, false, or designed to intimidate,
is not before us. We simply hold that upon this record
the broadcasts did not create such a clear and present
danger as to meet the constitutional test.

In view of our conclusion it is unnecessary to discuss
the other points raised in the briefs.

*Judgments reversed.*

MARKELL, J., filed the following dissenting opinion.

The gist of the decision in these cases is: (1) The
broadcasts in question did not constitute a "clear and
present danger" to the administration of justice. (2)
Freedom of speech and of the press, under the Four-
teenth Amendment, is paramount over the right to (*a*)
fair trial (*b*) by jury, under the Fourteenth Amend-
ment and the Maryland constitution, and includes a right
to substitute trial by newspaper or radio for trial by
jury. I am unable to concur in either of these con-
clusions or aspects of one conclusion.

In the factual aspect various contentions were urged
upon us in support of this conclusion, not all urged by
the same counsel or reflected in the court's opinion. It
was faintly argued that it is not known how many per-

sons the broadcasts reached—as if they were expected or intended to waste their poison on the desert air. The National Association of Broadcasters, which filed a brief as *amicus curiae,* evidently has no doubts on this score. In its brief it says, "While there are some 1,887 daily newspapers in existence, there are more than 2,631 radio stations licensed or about to be licensed to broadcast to the general public. There are now in excess of 83,000,-000 radios and 1,474,416 television sets in operation in the United States. And it is estimated conservatively that every day more than 135,000,000 people utilize the services rendered by such radio broadcast licensees." The American Newspaper Publishers Association in a brief filed by it as *amicus curiae* says, "This membership embraces more than 780 newspaper publishers whose publications represent approximately 90% of the total daily and Sunday circulation of newspapers published in the United States. The Association is vitally interested in the issue presented in these cases, namely, as to the right of persons to publish news stories concerning matters of vital public interest which may come before a court, free from censorship or intimidation by the court." In *Craig v. Harney,* 331 U. S. 367, 67 S. Ct. 1249, 1265, 91 L. Ed. 1546, the same association filed a brief as *amicus curiae,* which contained a statement that was almost exactly the same as the one just quoted (except that "780" was then "700" and "approximately 90%" was "in excess of 80 per cent") and was quoted by Mr. Justice Jackson in his dissenting opinion. He prefaced the quotation by saying, "In this very case the American Newspaper Publishers Association filed a brief *amicus curiae* on the merits after we granted *certiorari.* Of course, it does not cite a single authority that was not available to counsel for the publisher involved, and does not tell us a single new fact except this one". After the quotation he remarked, "This might be a good occasion to demonstrate the fortitude of the judiciary." 331 U. S. 367, 397, 67 S. Ct. 1249, 1264, 91 L. Ed. 1546. Other contentions, which

will not be mentioned, ranged from one pole to its opposite, *viz.*, (*a*) Prejudice in a jury can always be prevented. So, why worry? (*b*) Prejudice in a jury can never be prevented. So, why try?

There is (we are told) a panacea for preventing prejudice in a jury, *viz.*, examination of jurors on their *voir dire*. If perchance this panacea should prove to be less than a panacea, there is another one, *viz.*, change of venue. The first part of this contention is ascribed to Judge Alvey. *Garlitz v. State,* 71 Md. 293, 299, 18 A. 39, 41, 4 L. R. A. 601. Judge Alvey did not profess such faith—or any faith—in the questioning of jurors, an old procedure which then and now is habitually abused when there is no real prejudice but then and now is futile when actual prejudice is sufficiently deep-seated and widespread to be either unconscious or covered by perjury. In the *Garlitz* case a man had killed his wife on the street in Cumberland. So far as appears, no newspaper had printed more than the bare facts of the public killing, which without any printing would have quickly circulated in the community by word of mouth. The case did not involve a confession of the crime charged or other crimes or race or individual prejudice or any prejudice other than the "natural bias" of human beings against crime, which "in fair-minded men" produces impressions that are "always of a hypothetical nature" and do not prevent impartial consideration of facts and evidence. Judge Alvey, speaking for this court, refused to permit the right to challenge jurors for cause to be abused so as to exclude, not only prejudiced jurors, but all jurors except intellectual ciphers.

As a panacea, change of venue is no less futile than questioning of jurors. At best, neither panacea can avert a "clear and present danger" to the administration of justice, but either can only diminish or circumvent some consequences of an achieved obstruction of justice. Primarily, trial by jury is trial by a jury of the vicinage, selected from the whole body of those who are eligible. Change of venue is an exception, of neces-

sity, to the ordinary course. If by the wilful acts of sensation-venders this necessity is created, or the ranks of the eligible are thinned to those who are unconscious of prejudice or dishonest enough to deny it, then the administration of justice is not merely endangered or threatened but actually obstructed. *Downs v. State,* 111 Md. 241, 73 A. 893, 18 Ann. Cas. 786, is cited as an indication of presumed toughness of fibre of jurors. It was rather an illustration of the narrow scope of review, on appeal, of the discretion of the trial judge on an application for removal. Later, in *Lee v. State,* 161 Md. 430, 157 A. 723, this court, by Chief Judge Bond, stated more broadly the scope of review and the question before the trial court: "The meaning of discretionary power in a trial court, and the rules governing review of discretionary orders on appeal, have often been stated in vague, loose terms which furnish no exact guidance; but for the purposes of this case it seems to us sufficient to observe only that the judgment and discretion must be exercised in solving the exact problem of the law, upon all the considerations which properly enter into the problem and form it. * * * The problem before the judges, when removing this cause from the circuit court for Worcester county, was solely that of the selection of a new jurisdiction which, so far as could be seen, was likely to be free of the hazard of an unfair prejudiced jury. * * * It was not the problem of keeping order in the town and in the courtroom, or of preventing bodily injury to the accused or his counsel, but the further problem of obtaining a fair impartial jury to decide the case in such an orderly trial. It was not a problem, again, of having it adjudicated as a fact, with certainty, that a trial in one jurisdiction or another would not be fair and impartial, but a problem of the appearance of danger of having a material amount of unfairness and prejudice drawn into the jury box with persons taken from that neighborhood. And we dwell on this distinction because, upon the representations made to this court, there would appear to us to have been confusion on the

point in the lower court." 161 Md. at pages 441-442, 157 A. at page 727. In the *Downs* case eventually the jury disagreed and there was no verdict. If we should follow that case to its ultimate repository—in the gossip of forty years ago—we should find that the anti-Downs explanation of the outcome was that (*a*) arithmetic and bookkeeping tend more to confusion of a jury than to prejudice and (*b*) prejudice "backfired" by arousing a counter-prejudice against "higher-ups" supposed to be involved. In the instant cases one of the defenses was that what the appelants broadcasted the Police Commissioner had told them. This defense, now sympathetically received by this court, was first made in the Garden of Eden and is still made before juries, sometimes successfully.

Change of venue does not prevent obstruction of justice, but is only an attempt to flee from it. Flight from the radio is futile. The Maryland Reports teach us that race prejudice is usually more intense in homogeneous rural communities than in Baltimore. *Dutton v. State,* 123 Md. 373, 91 A. 417, Ann. Cas. 1916C, 89; *Fountain v. State,* 135 Md. 77, 79, 107 A. 554, 5 A. L. R. 908; *Lee v. State,* 161 Md. 430, 157 A. 723; *Jones v. State,* 185 Md. 481, 45 A. 2d 350. Unlike newspapers, the radio penetrates sparsely settled communities no less than large cities. The more rural the community, perhaps the fewer competing interests to distract attention from the radio.

This court mentions the fact that at James' trial before a judge without a jury his record came out [not without his consent] in medical testimony and his confession was admitted in evidence. This fact is irrelevant and also incomplete. Neither his record, which was indirectly disclosed, nor his confession, which was admitted in evidence as such, included the confession (which the broadcasts included) of rape upon an adult white woman a short time before the murder of the child. Aside from this discrepancy between the evidence admitted at the trial by law and that introduced in the

trial by radio, comparison between the two trials is only the time-dishonored excuse or apology for lynch law, *viz.*, that it usually reaches, more expeditiously, the same result as would be reached by due process of law. A "clear and present danger" or a "serious and imminent threat" to the administration of justice, or a "danger" or "threat" qualified by any other adjective, necessarily may be something short of an accomplished obstruction of justice. If this were not so, the danger or threat could not be averted or punished except by waiting till the victim is hanged and then proving him innocent. Mr. Justice Holmes, when he first gave utterance to the "literary phrase" "clear and present danger", in a prosecution under the Espionage Act [now 18 U. S. C. A. §§ 794, 2388] for attempting to cause insurbordination in the military forces, said, "We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. *Aikens v. Wisconsin*, 195 U. S. 194, 205, 206, 25 S. Ct. 3, 49 L. Ed. 154. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. *Gompers v. Buck's Stove & Range Co.*, 221 U. S. 418, 439, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A., N. S., 874. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right. It seems to be admitted that if an actual obstruction of the recruiting service were proved, liability for

words that produced that effect might be enforced. The statute of 1917 in section 4, punishes conspiracies to obstruct as well as actual obstructions. If the act, (speaking, or circulating a paper,) its tendency and the intent with which it is done are the same, we perceive no ground for saying that success alone warrants making the act a crime." *Schenck v. United States,* 249 U. S. 47, 52, 39 S. Ct. 247, 249, 63 L. Ed. 470.

No case has been cited, and I have found none, in which so much inflammatory matter, prejudicial to fair trial by jury, has been compacted into one short publication as was done in these broadcasts. The prejudicial nature of the ingredients of these broadcasts has been recognized by various courts, including this court. The words "clear and present danger" are no part of English law, but the fact that trial by newspaper is a clear and present danger to trial by jury is recognized by English judges. After Dr. Crippen murdered his wife and fled from England and had been arrested at Quebec, but before he was indicted, a London newspaper published a report of an alleged confession by him at Quebec. On citation for contempt the King's Bench Division (Mr. Justice Darling, Mr. Justice Pickford and Lord Coleridge) held that the court was not without jurisdiction because the publication occurred before indictment. "It is possible very effectually to poison the fountain of justice before it begins to flow". *Rex. v. Parke,* 1903, 2 K. B. 432, 437, quoted in *Globe Newspaper Co. v. Commonwealth,* 188 Mass. 449, 450, 74 N. E. 682, 3 Ann. Cas. 761. On the facts, referring to the publication, Mr. Justice Darling said: "That was really saying that Crippen had made a confession and that he had confessed to the crime in respect of which he was charged, and that it was only a matter of dispute as to the term whether one calls it an admission or confession. The effect upon the prisoner would be precisely the same by whatever name it was called. It was that he had admitted himself guilty of the crime with which he was charged. Anything more calculated than

that to prejudice the defense of a man can hardly be conceived. This statement is circulated among those who will be jurors at the trial, if the accused were committed for trial, because the jurors are drawn from the whole body of the county of Middlesex, in which this paper is widely circulated. No one can suppose that the jury-men entered the box in this case without ever having heard of it; but the less they hear of a case before they come to listen to the evidence the better, and newspapers do not help in the administration of justice by publishing what I can only describe as idle gossip, which at best may have been wormed out of those who had the man is custody or who were engaged in investigating the case when he was being charged before the judge in Quebec. * * * The court, therefore come to the conclusion that a contempt of court was committed here, as was admitted, once the point of law was got rid of, in the publication of this matter; and we are of the opinion that it was a very grave contempt of court. It is most important that the administration of justice in this country should not be hampered, as it is hampered in some other countries, and it is not enlarging the jurisdiction of this court—it is refusing to narrow the jurisdiction of this court—when we say that we are determined while we are here to do nothing to substitute in this country trial by newspaper for trial by jury; and those who attempt to introduce that system in this country, even in its first beginnings, must be prepared to suffer for it." *Rex v. Clarke, Ex parte Crippen,* 1910, K. B. D., 103 L. T. R. 636, 639-640.

On March 25, 1949, Lord Goddard, Lord Chief Justice, fined the Daily Mirror £10,000 and sent its editor to prison for three months for contempt of court in publishing a story about a murder case. The charge was that the publication had prejudiced the accused's defense. Lord Goddard (to quote, in the absence of an official report, the Associated Press report in the Baltimore newspapers) said: "Anybody who has had the misfortune, as this court has had, to read these articles

must be left wondering how it can be possible for that man to obtain a fair trial after that which has been published in this paper. Not only does it describe him as a vampire and proceed to give reasons why they call him a vampire but in addition to saying he has been charged with the particular murder of which he has been charged, these articles go on to say not merely that he is charged with other murders, but that he has committed others and gives the names of persons, whom, they say, he has murdered."

This court politely passes over the English cases, as if they may reflect an un-American prejudice against trial by newspaper. Nelles and King, apologists for trial by newspaper, foes of punishment for contempt by publication and prophets of *Nye v. United States,* 313 U. S. 33, 61 S. Ct. 810, 85 L. Ed. 1172, offer a less flattering explanation of the comparative paucity of American cases on the conflict between trial by newspaper and trial by jury, *viz.,* lack of fortitude on the part of judges. *Nelles and King, Contempt by Publication,* (1928) 28 Columbia Law Review 401-431, 525-562. "The elimination of outside influence by publication seems impracticable where it would be most desirable, and undesirable in many cases where it might be practicable. It would be most desirable to eliminate it where it is most rampant —in sensational jury cases involving crime or sex. Obviously, however, efforts to eliminate it in such cases bulk almost negligibly. In only fifteen out of fifty-eight reported cases of publications held punishable since 1831 did the publication relate to a case on or near trial before a petit jury. Only five of these fifteen jury cases appear to have been of a character to interest the sensational press. [Two of these five were *Ex parte Burns,* Md. Crim. Ct. of Baltimore, 1927, before Judge O'Dunne, and *Globe Newspaper Co. v. Commonwealth,* 188 Mass. 449 (74 N. E. 682, 3 Ann. Cas 761)]. Mr. Henry W. Taft's collection of instances in which the 'trial by newspaper' of sensational cases has proceeded with impunity might easily be augmented by any reader from his own

observation. Mr. Taft, a believer generally in a wide scope of unchecked judicial power, concedes that it is idle to expect that many judges will have the hardihood to brave the sensational press by punishing as contempts its circulation-breeding excesses. Except in this class of cases 'trial by newspaper' is rarely an unmixed evil". [Footnotes omitted.] 28 Col. L. R. 548-549.

Fortunately for the administration of justice—to date —the Baltimore judges for the last decade or two (*i. e.*, before and since adoption of Rule 904) have had the "hardihood" and also the judgment, tact and self-restraint, without exhibitions of power, personalities or pique on their part, to check and stop trial by newspaper in its worst forms. The Baltimore newspapers likewise have, in good faith and with apparent willingness, cooperated toward this end. In the instant cases, the newspapers are confronted by the possibility of "unfair competition" from the radio. Whatever the motives, one Baltimore newspaper publisher, as *amicus curiae,* has filed a most excellent and helpful brief in support of appellants' position.

In *Globe Newspaper Co. v. Commonwealth,* 1905, 188 Mass. 449, 74 N. E. 682, 3 Ann. Cas. 761, a newspaper, which had published part of the evidence for the prosecution before the trial of a murder case, was convicted of contempt. In affirming the conviction the court said, "It needs no argument to show that such publications were highly improper, and were a gross interference with the administration of justice in an important criminal case. The effect of the first publication, as described in the second, was such as no newspaper publisher had a right to attempt to produce in anticipation of a trial. In *Hunt v. Clarke,* 58 L. J. Q. B. 490, Lord Justice Cotton said in the opinion: 'If anyone discusses in a paper the rights of a case, or the evidence to be given before the case comes on, that, in my opinion, would be a very serious attempt to interfere with the proper administration of justice. It is not necessary that the court should come to the conclusion that a judge or a jury

will be prejudiced, but if it is calculated to prejudice the proper trial of a cause, that is a contempt, and would be met with the necessary punishment in order to restrain such conduct.' The effect of this publication would naturally be to absolutely disqualify many persons to sit as jurors, and thus make more difficult the work of the court in endeavoring to impanel an impartial jury. It would be likely, even without their consciousness of bias, to affect the minds of other persons, who might be permitted to sit upon the jury, on the ground that they had not formed such an opinion as to render them unfit to perform this public duty. In other ways which it is not necessary to state, such publications might be detrimental to the public interest involved in the pending case." 188 Mass. at pages 452-453, 74 N. E. at page 684, 3 Ann. Cas. 761. The court does not say "clear and present danger" but in the words quoted describes a clear and present danger to trial by jury—not with respect to the judge, who must now be presumed to possess fortitude to surmount such danger.

Judge Bond was well aware of the danger (and the effect) of race prejudice and trial by newspaper to trial by jury. Referring to waiver of jury trial and election of trial without a jury, he said, "The reasons which prompt the choice of a trial before the court in one case and another are, of course, many and various. * * * But there are more important reasons. Fear of the effect of popular prejudice upon a jury, either because of the nature of the charge, or because of something connected with the accused personally, is a very frequent ground of choice. It is common for defendants with known bad records to prefer trial before the court alone. And when the crime has aroused anger in the community from which the jury is chosen, trial before the court is frequently preferred. * * * Charges of a revolting nature, as of crimes against women and girls, seem to be tried more frequently before the court. Trial before the court, again, has been preferred in cases in which it has been feared that newspaper discussion might

render the jury impatient of any defense, or of some particular defense. Trial by the court offers an escape from some of the evils of 'trial by newspaper', or, at least, some mitigation of them. Negro prisoners constitute a large proportion of the defendants in the criminal courts of Maryland and they frequently prefer this method of trial to avoid any race prejudice in the jury box. Negro men charged with crimes against women commonly elect trial by the court alone". *The Maryland Practice of Trying Criminal Cases by Judges alone, without Juries,* (1925), 11 A. B. A. Jour. 699, 702. Judge Eli Frank has expressed similar views. *Trying Criminal Cases without Juries,* 17 Virginia Law Review, 253.

At the argument it was suggested that because of the smoldering prejudice in any jury, courts should not try to prevent newspapers and the radio from arousing this prejudice. This suggestion is an inversion of the normal view of Mr. Justice Holmes that the greater the prejudice the greater the "clear and present danger" of fanning it into flames. *Schenck v. United States, supra.* Even though a Negro may eventually waive a jury trial to escape any race prejudice in a jury, he has a right to be protected, against newspapers and radio, from the necessity of such a choice. "A citizen should not be coerced to relinquish his right to a jury trial and submit to a trial before the court, in order to escape an intolerable situation of a trial before a prejudiced jury". *Jones v. State,* 185 Md. 481, 486, 45 A. 2d 350, 352.

At the argument appellants commended to our consideration the able brief for a radio station whose case has not yet been brought to hearing in this court but will actually be governed by the decision in the instant cases. In this brief we are admonished that it would be very "serious" "to place in hands of people who would condemn our system" the finding of Judge Gray "that [quoting from the brief, not Judge Gray] this man James, who by every fact was but a mad dog, had been deprived of his constitutional right of jury". Evidently the sacred right and duty of furnishing information to

the public would stop short of letting "people who would condemn our system" know that we dispose of human "mad dogs" only by due process of law. The "mad dog" philosophy of criminal justice, which underlies lynch law, is a concise, familiar expression of precisely the kind of prejudice that was inevitably aroused by these broadcasts. (a) A Negro man, (b) who has a criminal record, is said to have confessed (c) murder of an eleven year old white girl and (d) recent rape of a white woman. Being a "mad dog", he should be disposed of as summarily as possible, without waste of time and money on an orderly trial, or even on investigation of his sanity. This philosophy may have no logical relation to race prejudice, but prejudice is not logical and a white man charged with crime against a Negro woman is not a "mad dog". This kind of prejudice is actually intensified by efforts of this court to combat it after the event. *Cf. Dutton v. State, supra; Fountain v. State, supra; Lee v. State, supra,* also 163 Md. 56; *Jones v. State, supra.* Reversals on such "technicalities" as denial of due process, and consequent new trials, are regarded as intolerable delays which illustrate the advantages of the "mad dog" philosophy.

Until this collision with the right of trial by newspaper and radio, this court has looked far to find prejudice in evidence or mention, before a jury, of other crimes or of confessions not proved to be admissible. In *Dobbs v. State,* 148 Md. 34, 129 A. 275, the court held that in a trial without a jury admission of evidence of another crime was reversible error. Three judges dissented because the case had been tried before three experienced judges without a jury. Four of the eight judges were of the opinion that permitting mention of other crimes in the State's Attorney's opening statement was also reversible error. This court has been unanimous in the opinion that evidence as to admissibility of a confession should be heard out of the presence of the jury, because the jury is apt to be unduly influenced by knowledge of a confession that is incompetent and

inadmissible, although the confession may have been excluded and the jury instructed not to consider it. *Smith v. State,* 189 Md. 596, 604-606, 56 A. 2d 818, 822-823. Immediately after the argument in the instant cases, the court heard reargument of a murder case and was a second time equally divided on the question whether permitting mention, in the presence of the jury, of the fact (not the contents) of a statement by the deceased, which out of the presence of the jury was afterwards ruled not admissible as a dying declaration, was reversible error. The court now says that "we are not concerned with deliberate attempts to influence the outcome of a pending case" and that "the statements were not argumentative, but factual". A few weeks ago the relative force of "argumentative" and "factual" statements was appraised in holding that error in stopping, and directing the jury to disregard, a legitimate argument for the accused was not reversible error because the jury could have made the argument for themselves after they were directed to disregard it. *Wood v. State,* 192 Md. 643, 651-653, 65 A. 2d 316, 320-321. Appellants understand their business and the effect of their broadcasts. They intend the natural consequences of their deliberate acts. The difference between intent and effect is not material. Our concern with appellants is not with the effect of sin upon their consciences but with the effect of their broadcasts upon the administration of justice. To hold that, after a juror is sworn to decide a case on the evidence alone, it may be assumed that he will violate his oath and pursue "factual statements" and surmises unsupported by evidence, but before he is sworn newspapers and radio have a constitutional right to poison his mind, is a grim way to keep the word of promise to the ear and break it to the hope.

In quantity, the Baltimore judges necessarily have the largest experience regarding the effect of prejudice on jury trials. In quality, Judge Gray's experience may be more varied. His circuit includes most of the second or third largest "city" in Maryland (suburban Wash-

ington) and also several of the most rural counties. He says, "Now, the court can not help but feel that the broadcast referred to in these cases must have had an indelible effect upon the public mind and that that effect was one that was bound to follow the members of the panel into the jury room. The court hardly needs evidence in this factual situation to reach the conclusion that Jame's free choice to either a court trial on the one hand and a jury trial on the other, has been clearly and definitely interferred with." I think Judge Gray is right.

This court holds that under the decisions of the Supreme Court (*Bridges v. California,* 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192, 159 A. L. R. 1346; *Pennekamp v. Florida,* 328 U. S. 331, 66 S. Ct. 1029, 90 L. Ed. 1295, and *Craig v. Harney,* 331 U. S. 367, 67 S. Ct. 1249, 91 L. Ed. 1546) the judgments below violate the freedom of speech and of the press under the Fourteenth Amendment. If this is the correct interpretation of these decisions, of course they are conclusive. If there had been no right of trial by jury in Maryland, they would have been conclusive. In the *Craig* case, it is said, "Conceivably, a plan of reporting on a case could be so designed and executed as to poison the public mind, to cause a march on the court house, or otherwise so disturb the delicate balance in a highly wrought situation as to imperil the fair and orderly functioning of the judicial process." 331 U. S. at page 375, 67 S. Ct. at page 1254, 91 L. Ed. 1546. A power to punish for contempt, which comes into being only when "a march on the court house" is begun—or called, is an imponderable. For practical purposes, under the decisions to date, there is no power to punish, as contempt, publications which attempt to coerce the administration of justice by judges. This is not because the court professes no concern for the administration of justice; on the contrary it professes great concern. "The other evil feared, disorderly and unfair administration of justice, is more plausibly, associated with restricting publications which touch upon pending litigation. The very word 'trial' connotes de-

cisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. California*, 314 U. S. 252, 271, 62 S. Ct. 190, 197, 86 L. Ed. 192, 159 A. L. R. 1346. The court has not said that the fair and orderly administration of justice may be subordinated to freedom of speech and comment. In the *Pennekamp* case, *supra*, the court said: "The [*Bridges*] case placed orderly operation of courts as the primary and dominant requirement in the administration of justice". 328 U. S. 331, 334, 66 S. Ct. 1029, 1031, 90 L. Ed. 1295. "Courts must have power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action. In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases. Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." 328 U. S. 331, 347, 66 S. Ct. 1029, 1037, 90 L. Ed. 1295. "Neither those cases [*Bridges* and *Pennekamp*] nor the present one raises questions concerning the full reach of the power of the state to protect the administration of justice by its courts." *Craig v. Harney*, 331 U. S. 367, 373, 67 S. Ct. 1249, 1253, 91 L. Ed. 1546.

The reason why attempts to coerce judges by threats and other attacks are held not to be "clear and present dangers" to the administration of justice is that all judges are expected to have more "fortitude, firmness, wisdom and honor" than can be expected from everyone in private life. In the three cases this is the *ratio decidendi* and the point of departure between the majority and the minority of the court. Mr. Justice Frankfurter, in his dissenting opinions in the *Bridges* case (Chief Justice Stone, Mr. Justice Roberts and Mr. Justice Byrnes concurring) and the *Craig* case (Chief Justice Vinson concurring) and his concurring opinion in the

*Pennekamp* case, and Mr. Justice Jackson, in his dissenting opinion in the *Craig* case, sharply deny what Mr. Justice Jackson calls "the myth that judges are not as other men are." 331 U. S. 367, 396, 67 S. Ct. 1249, 1264, 91 L. Ed. 1546. The "myth" is not a fact; it is a working fiction, *i. e.*, it is law. It is not for us to pass upon the wisdom of these decision or the philosophy that underlies them. The decisions and the philosophy are at least understandable. Judge-baiting is now a constitutional right. The court in effect says that "judges are *not regarded* as other men are." This is not flattery; it gives judges no rights or protection but imposes on them, and not on their assailants, responsibility for coercion of them.

The question that now confronts us is whether these decisions and the underlying philosophy deny the state power to prevent or punish poisoning the fountain of justice in trial by jury. The relevant features of the cases are: (*a*) None of the three cases involved any danger to jury trial. In the *Bridges* and *Craig* cases the accused timed their blasts at the judge after the jury had completed their function. (*b*) The "myth" that judges are regarded as supermen is inapplicable to jurors, who are only a cross-section of the community, hold no office and have only ephemeral existence as jurors. (*c*) All references to jury trial in majority or minority opinions recognize this difference between judges and jurors. (*d*) None of the justices have suggested that jurors may be like judges in this respect, though the dissenters, denying the "myth", have suggested that judges may be not wholly unlike jurors.

In the *Bridges* case, referring to one of the editorials in question, the court said, "To regard it, therefore, as in itself of substantial influence upon the course of justice would be to impute to judges a lack of firmness, wisdom, or honor, which we cannot accept as a major premise." 314 U. S. 252, 273, 62 S. Ct. 190, 199, 86 L. Ed. 192, 159 A. L. R. 1346. In the same case Mr. Justice Frankfurter said, "If it is true of juries it is

not wholly untrue of judges that they too may be 'impregnated by the environing atmosphere.' Mr. Justice Holmes in *Frank v. Mangum,* 237 U. S. 309, 349, 35 S. Ct. 582, 596, 59 L. Ed. 969," 314 U. S. 252, 300, 62 S. Ct. 190, 211, 86 L. Ed. 192, 159 A. L. R. 1346. In the *Pennekamp* case, referring to an editorial, the court said, "The comments were made about judges of courts of general jurisdiction—judges selected by the people of a populous and educated community. They concerned the attitude of the judges toward those who were charged with crime, not comments on evidence or rulings during a jury trial. Their effect on juries that might eventually try the alleged offenders against the criminal laws of Florida is too remote for discussion. Comment on pending cases may affect judges differently. It may influence some judges more than others. Some are of a more sensitive fiber than their colleagues. The law deals in generalities and external standards and cannot depend on the varying degrees of moral courage or stability in the face of criticism which individual judges may possess any more than it generally can depend on the personal equations or individual idiosyncrasies of the tort-feasor. *The Germanic,* 196 U. S. 589, 596, 25 S. Ct. 317, 318, 49 L. Ed. 610; *Arizona Employers' Liability Cases,* 250 U. S. 400, 422, 432, 39 S. Ct. 553, 556, 560, 63 L. Ed. 1058, 6 A. L. R. 1537. We are not willing to say under the circumstances of this case that these editorials are a clear and present danger to the fair administration of justice in Florida. *Cf. Near v. Minnesota,* 283 U. S. 697, 714-715, 51 S. Ct. 625, 630, 631, 75 L. Ed. 1357. What is meant by clear and present danger to a fair administration of justice? No definition could give an answer. Certainly this criticism of the judges' inclinations or actions in these pending non-jury proceedings could not directly affect such administraition. This criticism of their actions could not affect their ability to decide the issues. Here there is only criticism of judicial action already taken, although the cases were still pending on other points or might be revived by

rehearings." 328 U. S. 331, 348, 66 S. Ct. 1029, 1039, 90 L. Ed. 1295. Referring to a suggestion that a judge may be influenced to placate an accusing newspaper to secure reelection, the court said, "In this case too many fine-drawn assumptions against the independence of judicial action must be made to call such a possibility a clear and present danger to justice. For this to follow, there must be a judge of less than ordinary fortitude without friends or support or a powerful and vindictive newspaper bent upon a rule or ruin policy, and a public unconcerned with or uninterested in the truth or the protection of their judicial institutions." 328 U. S. 331, 349, 66 S. Ct. 1029, 1038, 90 L. Ed. 1295. In the *Craig* case, referring to an editorial which denounced a judge and tried to force him to grant a new trial in a landlord and tenant case after he had required a recalcitrant jury to render a directed verdict, the court said, "The fact that the jury was recalcitrant and balked, the fact that it acted under coercion and contrary to its conscience and said so were some index of popular opinion. A judge who is part of such a dramatic episode can hardly help but know that his decision is apt to be unpopular. But the law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate. Conceivably a campaign could be so managed and so aimed at the sensibilities of a particular judge and the matter pending before him as to cross the forbidden line. But the episodes we have here do not fall in that category. Nor can we assume that the trial judge was not a man of fortitude." The court also said, "Judges who stand for re-election run on their records. That may be a rugged environment." 331 U. S. 367, 377, 67 S. Ct. 1249, 1255, 91 L. Ed. 1546.

The *Bridges* case appears to have been cited in almost fifty cases in state courts or lower federal courts. We have been referred to no case, and I have found none, in which the effect of a publication on trial by jury was

involved and in which either the *Bridges, Pennekamp* or *Craig* case was cited.

This court now says: "It is suggested that the Supreme Court, which has not hesitated to extend the constitutional protection to procedural due process, might take a different view where juries or potential juries are concerned, rather than trial judges. The distinction is hardly tenable. Judges are not so 'angelic' as to render them immune to human influences calculated to affect the rest of mankind. Conversely, while juries represent a cross-section of the community, it cannot be denied that in every community there are citizens who by training and character are capable of the same firmness and impartiality as the judiciary". In the *Pennekamp* case Mr. Justice Frankfurter says, "To deny that bludgeoning or poisonous comment has power to influence, or at least to disturb, the task of judging is to play make-believe and to assume that men in gowns are angels." 328 U. S. 331, 359, 66 S. Ct. 1029, 1043, 90 L. Ed. 1295. This is Mr. Justice Frankfurter's view, not the view of the majority of the court. With great respect for the opinion of my colleagues, I think the conclusion of this court (*a*) purports to follow the Supreme Court decisions, but (*b*) rejects that court's doctrine, and adopts the minority view, as to the relation of *judges* to publications and (*c*) departs from that court's decisions, and from the reasoning of all the justices, by applying the disputed doctrine, regarding judges, to jurors, to whom none of the justices have applied it.

To interpret, and apply to the facts of the instant cases, these three decisions on freedom of speech and of the press is a difficult problem. In undertaking it we cannot ignore other Supreme Court decisions on other constitutional rights during the long period of seven years since the *Bridges* case and the more gradual period of the previous twenty-five years. No recent constitutional development has been more marked or more rapid than the expansion of the Fourteenth Amend-

ment with respect to (*a*) so-called "procedural due process" and the all-comprehensive right to a fair trial in criminal prosecutions and (*b*) both the substantive and the adjective law regarding race prejudice and discrimination. Even outside the field of constitutional rights, if Maryland were part of the District of Columbia, James' confession would not have been admissible in evidence. *McNabb v. United States,* 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819; *Upshaw v. United States,* 335 U. S. 410, 69 S. Ct. 170; *James v. State,* 193 Md. 31, 65 A. 2d 888. Admission of an involuntary confession in evidence may amount to denial of due process. *Haley v. Ohio,* 332 U. S. 596, 68 S. Ct. 302, 92 L. Ed. 224; *Lisenba v. California,* 314 U. S. 219, 62 S. Ct. 280, 86 L. Ed. 166. Within a few months we have subordinated the Maryland concept of due process to the Supreme Court decisions regarding the right to counsel in a criminal case (*Raymond v. State ex rel. Szydlouski,* 192 Md. 602, 65 A. 2d 285), and have overruled our decisions regarding covenants in deeds involving race discrimination (*Goetz v. Smith,* 191 Md. 707, 62 A. 2d 602), to conform with Supreme Court decisions. A little earlier four justices of the Supreme Court voted to reverse a unanimous decision of this court which held that the drawing of jurors in Baltimore did not involve race discrimination. *Zimmerman v. State,* 191 Md. 7, 59 A. 2d 675, Id., 336 U. S. 901, 69 S. Ct. 469. Unless the Supreme Court says so, I cannot believe that the broad fundamental right to a fair trial can lawfully be defeated by a blast from the radio.

I think the judgments should be affirmed.