# THOMAS PAUL RAIMONDI *v.* STATE OF MARYLAND

[No. 554, September Term, 1970.]

*Decided June 23, 1971.*

The cause was argued before MURPHY, C. J., and MOR-
TON, ORTH, THOMPSON and POWERS, JJ.

*Leon H. A. Pierson* and *Russell J. White,* with whom
was *Ronald L. Spahn* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, Howard
L. Cardin, State's Attorney for Baltimore City,* and
*Joseph Kiel, Assistant State's Attorney for Baltimore
City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Thomas Paul Raimondi, the appellant, was convicted
in a jury trial in the Criminal Court of Baltimore of at-
tempted bribery, a violation of Md. Code, Art. 27, § 23.
Judge H. Kenneth Mackey, the presiding judge, imposed
a sentence of eighteen months and a fine of $500. Ap-
pellant alleges error with respect to (1) the use of tran-
scriptions of certain electronic recordings; (2) the in-
structions; (3) the prosecutor's cross-examination of the
appellant's character witnesses; (4) the prosecutor's
argument to the jury; and (5) failure to dismiss the in-
dictment because of pre-trial publicity. We see no merit
to any of the contentions.

This case grew out of the election in 1969 by the Gen-
eral Assembly of Maryland of a Governor to succeed Gov-
ernor Spiro T. Agnew, who had resigned on January 15,
1969 to take the post of Vice-President of the United
States on January 20, 1969.

There were one hundred eighty-five members of the
General Assembly of Maryland entitled to vote on the
governorship, forty-three in the Senate, and one hundred
forty-two in the House of Delegates. Of these, eight in
the Senate and twenty-five in the House of Delegates
were Republicans; thirty-five in the Senate and one hun-
dred seventeen in the House were Democrats. Ninety-
three were required to elect.

The chief prosecution witness, State Senator John J.

Bishop, Jr., from Baltimore County, testified that the appellant, Thomas Paul Raimondi, approached him, Bishop, by means of a telephone call at his home on November 27, 1968, and discussed the purchase of votes of the Republican members of the General Assembly for an unnamed candidate for the governorship. Mr. Bishop's testimony was that Mr. Raimondi at that time mentioned "3" per vote, which he assumed meant $3,000. per vote, for the thirty-three Republican votes, to be voted for an undisclosed candidate for Governor.

Mr. Raimondi's testimony was that Mr. Bishop had called him on November 2, 1968, ostensibly with reference to helping Raimondi clear up a campaign deficit, incurred in Mr. Raimondi's unsuccessful campaign as the Republican candidate for Congress in the Fourth Congressional District. Both Bishop and Raimondi agree that there was a discussion on this subject which had been initiated by Mr. Bishop and there is in evidence (Defendant's Exhibit 1) a copy of a letter dated November 7, 1968, wherein Mr. Raimondi informs Mr. Bishop of the amount of the deficit and Exhibit 1A, a list of unpaid bills. Mr. Raimondi testified that when Mr. Bishop called him he said something to the effect that "I hear they are trying to buy votes", speaking of the gubernatorial election, which had come into the conversation. According to Raimondi, he, Raimondi, said he had not heard anything about this, but asked whether Bishop was interested, and Bishop's reply was "I might be."

When Raimondi was the Republican candidate for Congress from the Fourth Congressional District, which included part of Baltimore County, Bishop had some control over the expenditure of funds and had refused to help Raimondi. Feeling ill-used, Raimondi conceived this situation as a means of getting back at Bishop, and, as he put it in his testimony, it back-fired. He said that the candidate for Governor, the money and the proposed bribe were all mythical figments of Mr. Raimondi's imagination, and that he had called Bishop back and strung him along to see how far he would go.

Although Mr. Bishop made several efforts to have money passed between the defendant and him, no money ever changed hands, nor did the defendant ever say that he actually had all or any of the money, nor was there any showing that he was in a position to get it if the deal progressed beyond the talking stage.

Mr. Bishop's daughter, Suzanne Bishop, testified that in November, 1968, when her father was in Annapolis, Maryland, she had received a telephone call from someone who identified himself as being Tom Raimondi, and that this person had given her two telephone numbers at which he could be reached. One was the office telephone number of one William Adelson, Plaza 2-6682, the other was 323-2255. The latter was not an active telephone number at the time of the alleged call, but Mr. Raimondi's office telephone number at the time was 727-2255, the last four digits corresponding with the last four digits of one of the numbers which Miss Bishop said she was given. The first three digits correspond with Mr. Raimondi's home telephone number, 323-7222.

Miss Bishop admitted that she did not know Mr. Raimondi before or since this alleged conversation and identified the caller as Mr. Raimondi only because the caller said that was his name. Appellant denied making this telephone call. He and his wife both testified that on the date and hour of this alleged telephone call they were in Washington, D.C. having dinner.

Mr. Bishop said that on receiving Mr. Raimondi's telephone call early in the morning of November 27, 1968, he thought it over for a minute or so and decided to call Colonel Robert Lally, Superintendent of the Maryland State Police, and arranged to meet him at the Pikesville Headquarters of the State Police. After talking with Mr. Lally, Mr. Bishop telephoned Mr. Raimondi from there but Raimondi was not in his office. He finally reached Mr. Raimondi on his third call, which was between 1:00 and 2:00 P.M. His testimony was:

"Q. What was the discussion you had on the phone at that time?

"A. Well, Colonel Lally had told me I should have a face-to-face contact with him, so I told him — I said 'I don't want to talk on the telephone about the thing you called me about this morning. I have had some interest expressed in it by others, and I would like to talk to you further about it.'

"Q. When you said you had some interest expressed in it by others, who did you have in mind when you said others?

"A. Colonel Lally."

He told Raimondi to wait in his office for his, Bishop's call, and called him at 2:00 P.M. and arranged to meet him at 3:30 P.M. He picked Raimondi up at Charles and Saratoga Streets and rode around with him for about fifteen minutes discussing the proposition, including a statement by Raimondi that his people wanted a minimum of twenty-five votes and would pay $3,000. per vote, up to a maximum of $75,000.

Mr. Bishop testified that he received another telephone call from Mr. Raimondi on December 2, 1968 at home. On December 3, 1968, at 11:00 A.M. Mr. Bishop met with Mr. Moylan, State's Attorney of Baltimore City, Mr. Helinski, his deputy, and Colonel Lally in Mr. Moylan's office. Mr. Bishop had called Mr. Raimondi earlier that morning at his home, having been instructed to be sure to do so. Mr. Bishop told Mr. Raimondi that he was trying to get some information and that he would be in touch with him later that date, which he did later that afternoon.

At the meeting in Mr. Moylan's office Mr. Bishop was instructed to make further contacts with Mr. Raimondi, which he did. At Mr. Moylan's suggestion, arrangements were made to use electronic equipment to record the conversations between Mr. Bishop and Mr. Raimondi. A Concord tape recorder was brought into Mr. Moylan's office and Mr. Bishop was instructed in its use. An appropriate warrant was obtained.

Four electronic recordings of conversations between Mr. Raimondi and Mr. Bishop were played back to the jury. The jury was given transcripts of these recordings and were permitted to refer to them during the playing of the recordings, during argument of counsel, and they were also given the transcripts to take into the jury room, all over the objection of the defendant. These electronic recordings took place on the following dates:

December 4, 1968, while Mr. Bishop and Mr. Raimondi were riding in Mr. Bishop's car in Baltimore City.

December 10, 1968, around 7:00 P.M. during a visit by Mr. Bishop to Mr. Raimondi's office in downtown Baltimore.

December 12, 1968, telephone conversation between Mr. Bishop and Mr. Raimondi.

December 16, 1968, telephone conversation between Mr. Bishop and Mr. Raimondi.

Mr. Bishop brought into their conversation the name of Mr. Dale Anderson, County Executive for Baltimore County, as being Raimondi's candidate, and, as Mr. Raimondi put it, he agreed with everything Bishop said. Raimondi also brought in the name of M. William Adelson, with whom he had once been associated in the practice of law as being one of those interested in the deal. Mr. Adelson and Mr. Anderson both indignantly denied having had anything to do with such a scheme, and the record is completely devoid of any evidence that they did, or that they had any knowledge of it, other than Mr. Bishop's recitations of what Raimondi had told him. Mr. Raimondi testified that there was no real scheme to buy votes and that he had no connection with either Mr. Adelson or Mr. Anderson.

After Mr. Bishop had met with Colonel Lally, he, either on his own account, or on instructions to get Mr. Raimondi to incriminate himself, called Mr. Raimondi several times to make appointments so that the conversations could be electronically recorded. Mr. Raimondi testified that he was trying to put the "charade" to an end but did not succeed in doing so until Mr. Bishop, Mr.

Moylan and Mr. Helinski felt that they had enough evidence for prosecution of Mr. Raimondi.

I Transcriptions of Electronic Recordings

Raimondi alleges the trial court erred:

(a) In permitting the transcripts to be given to the jury while the recordings were being played back to the jury.

(b) In permitting the transcripts to be introduced into evidence.

(c) In permitting the jury to have the transcripts during argument of counsel at the end of the case.

(d) In permitting the jury to take the transcripts into the jury room and having them during their deliberations upon their verdict.

To support his argument, Raimondi cites *Duggan v. Florida,* 189 So. 2d 890, *Basham v. Oklahoma,* 340 P. 2d 461 and *Bonicelli v. State,* 339 P. 2d 1063 (Okla.) the latter pertaining to tape recordings of confessions; he also cites a number of cases pertaining to what evidence the jury can take into the jury room. Since the errors, if any, were harmless, it will be unnecessary for us to discuss the authorities cited. We do, however, call attention to the cases cited in 58 A.L.R.2d 1024 at 1042 as well as three Maryland cases which have some bearing on the points raised. *McGuire v. State,* 200 Md. 601, 92 A. 2d 582; *Lynch v. State,* 2 Md. App. 546, 236 A. 2d 45, and *Tumminello v. State,* 10 Md. App. 612, 272 A. 2d 77.

It is specifically conceded on appeal and below that the transcriptions were accurate renditions of the words as occurred on the tapes. Although in his testimony Raimondi asserted some minor discrepancies in the tapes themselves, he admitted the substance of the conversations stating "all the conversations on these tapes, and I don't know how to make anybody understand this, is a figmentation [sic] of my imagination." He said this to support his assertion that he was attempting to "string along" Senator Bishop.

The crucial issue for determination by the jury was, therefore, whether Mr. Raimondi was perpetrating a hoax on Senator Bishop or was making an actual attempt to purchase his and others' votes in the General Assembly.

Since the issue in point involves not the occurrence of the conversations, nor the substantial accuracy of the tapes, nor the accuracy of the transcripts, but only the proper conclusion to be drawn, this Court does not see how either conclusion, hoax or bribe, is encouraged by the transcriptions. Specifically, we do not see how transcripts of the recordings in any manner harmed Raimondi's assertion he was playing a practical joke on Bishop.

## II Instructions

### A

The court instructed the jury in part as follows:

"Bribery has been defined as the voluntary giving or offering to any public official any sum of money to influence him in the performance of any official duties required of him. The essence of the crime of bribery is the passing of money to him in order to so influence him. It is essential that the gift or the offering be made with the corrupt intent to so influence him. Now, this is bribery I have just described. In this case the defendant is not charged with bribery, but attempting to bribe. I gave you the definition of bribery so we can more intelligently discuss the alleged crime of attempting to bribe. An attempt is an unsuccessful offer of a bribe or the commission of an act falling short of an offer. An attempt, generally speaking, has been said to be something which amounts to more than the preparation but falls short of actualy [sic] consummation of the crime of bribery in this case. The actual tender of a bribe is not necessary to make up the offense. That is, the

> actual passing of the money is not necessary, or the attempt to pass money is not necessary to make up the offense. Any expression of the ability to produce the amount offered is sufficient to constitute the crime of attempted bribery."

Raimondi duly excepted to that part of the charge which said an attempt is an "unsuccessful offer of a bribe or the commission of an act falling short of an offer" maintaining that under the indictment it was necessary for the State to prove the attempt to bribe by offering. Although confusing an offer with a tender, on appeal he expressly concedes that an expression of the willingness and ability to produce money could amount to an offer. The objection appears to have some merit only because it takes the sentence out of context. The fact that certain parts of the instructions, taken out of context, might give an inaccurate statement of the law does not make the instructions wrong provided the instructions taken as a whole accurately state the law. *Shotkosky v. State*, 8 Md. App. 492, 261 A. 2d 171; *Graef v. State*, 1 Md. App. 161, 228 A. 2d 480, and *Roberts v. State*, 4 Md. App. 209, 241 A. 2d 903.

In the instant case, the trial judge explained that an attempt amounted to more than preparation but must fall short of consummation, and further that tender was not necessary since any expression of ability to produce the amount offered is sufficient to constitute the crime of attempted bribery. While we cannot endorse the instruction as a model one, we do not see any prejudice to the appellant's position; we think the overall instruction correctly explained the law to the jury. See *Cunningham v. State*, 190 Md. 578, 59 A. 2d 337; Md. Code, Art. 27, § 23, and Perkins *Criminal Law*, Chapt. 5, § 3 (C) 3 page 403.

### B

Although the appellant in arguing the preceding objection stated, "The Court correctly explained to the jury that in order to constitute an offer there need not be an

actual tender of money", he contends that the court committed error in refusing the following instruction:

"That in order to find the defendant guilty of the crime with which he is charged, it is not sufficient for the State to show that there was a discussion of money to be paid, but there must be evidence of an actual attempt of the defendant to pay money to John J. Bishop, Jr."

He cites *United States v. Klosterman,* 248 F. 2d 191 (3d Cir., 1957), which concerns solely the question of entrapment; there is no contention concerning entrapment in the instant case. *Klosterman* provides no assistance in the present case as to what is necessary to constitute an attempt to bribe. We are aware of no authority that would support the instruction requested.

### III  Cross-Examination of Character Witnesses

Raimondi contends that the trial court erred in permitting the prosecuting attorney in cross-examining his character witnesses, more properly called a reputation witness's testimony, to ask them whether they had heard that in a 1963 case in which the appellant appeared as a witness, a particular federal court judge in Maryland stated Raimondi's testimony was utterly incredible, false, and the judge rejected it in its entirety. Appellant seems to concede that the question is within the scope of cross-examination questions of a character witness's testimony permitted under *Comi v. State,* 202 Md. 472, 97 A. 2d 129 wherein the Court allowed questions of such witnesses as to whether or not they had heard of the defendant's arrest, even though the arrest did not result in conviction. He contends that such questions must be carefully limited by the trial judge. He also questions the good faith of the State's Attorney, alleging that the absolute precision in the references to the date and the number of the federal opinion showed an intent to indirectly fix the appellant's alleged false testimony in 1963 as a matter of fact in the minds of the jury. Also he

argues the prosecutor did not attempt to establish whether or not the particular rumor or report would have probably reached the ears of the witnesses, all of whom denied having heard of the opinion.

Raimondi cites no case law to support his argument. The whole thrust of the cases indicate that the good faith requirement is met if the State satisfies the trial judge that the particular fact or rumor assumed in the question is supported by substantial evidence. The cases are collected in 47 A.L.R.2d 1258 at 1314 and in the *Later Case Service* to that annotation. In the instant case, the State satisfied the trial judge by producing the copy of the opinion in which the judge had made the statement attributed to him and there is no doubt that the federal judge did, in fact, say what was attributed to him.

Raimondi supports his argument that such questions should be severely limited by quoting from 3A Wigmore *Evidence,* § 988 at 920 (Chadbourn Rev. 1970) as follows:

> "But the serious objection to them is that practically the above distinction — between rumors of such conduct, as affecting reputation, and the fact of it as violating the rule against particular facts — cannot be maintained in the mind of the jury. The rumor of the misconduct, when admitted, goes far, in spite of all theory and of the judge's charge, towards fixing the misconduct as a fact upon the other person, and thus does three improper things — (1) it violates the fundamental rule of fairness. . . . that prohibits the use of such facts, (2) it gets at them by hearsay only, and not by trustworthy testimony, and (3) it leaves the other person no means of defending himself by denial or explanation, such as he would otherwise have had if the rule had allowed that conduct to be made the subject of an issue. Moreover, these are not occurrences of possibility, but of daily practice.

This method of inquiry or cross-examination is frequently resorted to by counsel for the very purpose of injuring by indirection a character which they are forbidden directly to attack in that way; they rely upon the mere putting of the question (not caring that it is answered negatively) to convey their covert insinuation. The value of the inquiry for testing purposes is often so small and the opportunities of its abuse by underhand ways are so great that the practice may amount to little more than a mere subterfuge, and should be strictly supervised by forbidding it to counsel who do not use it in good faith."

Although we think *Comi v. State, supra,* disposes of the issue in Maryland, we point to *Michelson v. United States,* 335 U. S. 469, 69 S. Ct. 213, 93 L. Ed. 168 for an excellent discussion of the problem. The Court said in part:

"Thus the law extends helpful but illogical options to a defendant. Experience taught a necessity that they be counterweighted with equally illogical conditions to keep the advantage from becoming an unfair and unreasonable one. The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue. Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose

rumors and reports that are current even if they do not affect his own conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans." 335 U. S. at 478-479.

* * *

"The trial judge was scrupulous to so guard it in the case before us. He took pains to ascertain, out of presence of the jury, that the target of the question was an actual event, which would probably result in some comment among acquaintances if not injury to defendant's reputation. He satisfied himself that counsel was not merely taking a random shot at a reputation imprudently exposed or asking a groundless question to waft an unwarranted innuendo into the jury box." 335 U. S. at 481.

* * *

"The inquiry as to an arrest is permissible also because the prosecution has a right to test the qualifications of the witness to bespeak the community opinion. If one never heard the speculations and rumors in which even one's friends indulge upon his arrest, the jury may doubt whether he is capable of giving any very reliable conclusions as to his reputation." 335 U. S. 483.

* * *

"A defendant in such a case is powerless to prevent his cause from being irretrievably obscured and confused; but, in cases such as the

one before us, the law foreclosed this whole confounding line of inquiry, unless defendant thought the net advantage from opening it up would be with him. Given this option, we think defendants in general and this defendant in particular have no valid complaint at the latitude which existing law allows to the prosecution to meet by cross-examination an issue voluntarily tendered by the defense." 335 U. S. 485.

In the instant case, defendant tendered his reputation to the jury and thus condoned the introduction against him of damaging evidence that otherwise would not be admissible. By requiring the State to show conclusive evidence of the federal judge's statement regarding Raimondi's testimony, the trial judge here took scrupulous pains to ascertain that the target of the question was an actual event and not a random shot. We do not think Raimondi can complain because the jury tested the qualifications of his friends to give a reliable conclusion as to his reputation and found the qualifications weak because the friends had not heard of the statement by the federal judge. Defendant having tendered the reputation issue, nothing would have precluded the State from offering in evidence before the jury a certified copy of the opinion of the federal judge under *Michelson v. United States, supra.* Raimondi's complaint concerning the detail of the question is drained of validity since the record conclusively established the truthfulness of the fact assumed therein, i.e., that the federal judge actually said what the question indicated he had said.

### IV Prosecutor's Argument

Appellant contends the cross-examination and argument of the State's Attorney resulted in unfair prejudice. He cites *Holbrook v. State,* 6 Md. App. 265, 250 A. 2d 904, 906, in which we said, "In short, the prosecutor should make no remark 'calculated to unfairly prejudice the jury against the defendant' ". Appellant alleges

that the State's cross-examination and arguments that the appellant and his witnesses were "political bosses, dishonest and unworthy of belief" was improper argument. We do not agree. The very purpose of cross-examination is to test the honesty and veracity of the statements made on direct examination. Although the State attempted to establish the witnesses were other than honest, we see no unfairness.

As to the closing argument, the appellant made no exceptions or objections below, and the matter is not before us for review under Md. Rule 1085.

### V Pre-trial Publicity

On December 19, 1968, the indictment of the grand jury of Baltimore City was returned against appellant. On the same day, the State's Attorney for Baltimore City issued the following statement:

"FOR IMMEDIATE RELEASE

"STATEMENT OF CHARLES E. MOYLAN, JR.,
BALTIMORE STATE'S ATTORNEY

"Thursday, December 19, 1968, 2:00 P.M.

"The Baltimore Grand Jury this morning returned a one-count indictment against local attorney Thomas Paul Raimondi. The indictment charges that during the time period of November 27, 1968, through December 18, 1968, Mr. Raimondi did attempt to bribe State Senator John J. Bishop, Jr. of the Fourth Legislative District of Baltimore County. Mr. Raimondi, acting for himself and ostensibly for others, according to the charge, did offer Senator Bishop the sum of between $75,000 and $100,000. For that sum, Senator Bishop was to deliver the votes, including his own, of not less than twenty-five and up to all thirty-three of the Republican members of the General Assembly of Maryland in the forthcoming balloting in that Gen-

338

eral Assembly to select a gubernatorial successor to Vice-President-elect Spiro T. Agnew. Those votes were to be cast for a candidate to be named by Mr. Raimondi or by those for whom he was allegedly acting.

"The investigation that led to today's indictment has been in progress for three weeks. Only six persons have been aware that the investigation has been going on — Senator Bishop himself; Colonel Robert J. Lally, Superintendent of the Maryland State Police; Governor Agnew; Judge J. Gilbert Prendergast of the Supreme Bench of Baltimore City; myself as State's Attorney; and Deputy State's Attorney George J. Helinski.

"Senator Bishop was initially approached by telephone on November 27. He immediately communicated the bribe offer to Colonel Lally and to Governor Agnew. Senator Bishop then contacted the State's Attorney's Office of Baltimore City. Acting on the instructions of Colonel Lally, Mr. Helinski, and myself, Senator Bishop pretended to go along with the scheme. A number of conferences between Senator Bishop and Mr. Raimondi were held throughout the ensuing three weeks, in automobiles, in a law office, and by telephone. On court orders applied for by myself and authorized by Judge Prendergast, most of those conversations were electronically recorded.

"All of this information was communicated in my office earlier this afternoon to the following legislative leaders: President of the Maryland Senate William S. James, Senate Majority Leader Harry R. Hughes, Senate Minority Leader Edward T. Hall, Speaker of the House of Delegates Marvin Mandel, House Majority Leader Thomas Hunter Lowe, and House Minority Leader John S. McInerney.

"Mr. Raimondi has been released on his own recognizance. His arraignment is scheduled for 10:00 A.M. tomorrow morning in Part I of the Criminal Court before Judge Charles D. Harris. In the interest of maintaining public confidence in our legislative process and of removing any taint of suspicion from many innocent persons, this office will ask Judge Harris to schedule this case for trial as expeditiously as possible, compatibly with the interests of justice."

The media generally reported the substance of the press release.

On appeal, appellant contends the trial court erred in refusing to dismiss the indictment against him because of the pre-trial publicity generated by the State's Attorney. This contention was raised in a pre-trial appeal, *Raimondi v. State*, 8 Md. App. 468, 261 A. 2d 40, which was dismissed as premature.

Initially, it is important to accurately view the scope of the relief requested. Neither now nor in the earlier proceedings does appellant request the relocation of his trial, although he might have been granted a change of venue. Neither now nor in his earlier proceedings does appellant request a delay of his trial, although he might have been granted a continuance. Thus, he asks for no less a remedy than no trial at all, which is clearly an extreme and unjustified remedy. This Court is aware of no appellate precedent which would require that an accused be allowed to go completely free with no trial due to pre-trial publicity.

Unlike *Sheppard v. Maxwell*, 384 U. S. 333, 86 S. Ct. 1507, 16 L.Ed.2d 600, or *Estes v. Texas*, 381 U. S. 532, 85 S. Ct. 1628, 14 L.Ed.2d 543, we do not here see inherent prejudice from publicity which saturated the community. Although appellant claims that it will be impossible for him to have a fair trial "in the foreseeable future", we will not so readily assume that an unbiased

trier of fact cannot be found, *Grammer v. State,* 203 Md. 200, 100 A. 2d 257, *cert. den.* 347 U. S. 938, 74 S. Ct. 634, 98 L. Ed. 1088, especially since as a practical matter trials cannot be held in a vacuum hermetically sealed against rumor or report. It also appears that appellant held his own conversations with the press and thus possibly himself generated some of the publicity. In making this analysis, we do not condone a State's Attorney publicly revealing evidence to support an indictment; we affirm for the reasons hereinafter stated.

The trial in this case was only after a lengthy hiatus between the indictment and the trial. The hiatus was 16 months as opposed to significantly shorter periods in *James v. State,* 193 Md. 31, 65 A. 2d 888 (arraigned July 13, 1948, tried September 20, 1948, *Baltimore Radio Show v. State,* 193 Md. 300, 67 A. 2d 497) or *Grammer v. State, supra,* (arraigned September 16, 1952, tried October 14, 1952.) After the election by the General Assembly of a new Governor on January 7, 1969 (appellant was tried on April 20, 1970), the publicity almost completely ceased. There was a lengthy voir dire. Thirteen of the prospective jurors admitted having been aware of the publicity. All stated it would in no way affect their verdict. Three of the thirteen were permitted to serve on the panel. We note that the defense used only seventeen of the twenty regular peremptory challenges permitted by Md. Rule 746, and only three of the four challenges permitted under Md. Rule 748 in the selection of two alternate jurors. Thus, the only three jurors who admitted knowledge of the publicity could have been removed from the panel had Raimondi so desired. We see no prejudice.

*Judgment affirmed.*
*Appellant to pay the costs.*