HENRY GIBSON *v.* STATE OF MARYLAND

[No. 413, September Term, 1972.]

\* \* \*

JOHN E. TATE *v.* STATE OF MARYLAND

[No. 464, September Term, 1972.]

\* \* \*

ROBERT T. AUSTIN *v.* STATE OF MARYLAND

[No. 629, September Term, 1972.]

*Decided February 28, 1973.*

The cause was argued before THOMPSON, GILBERT and DAVIDSON, JJ.

In appeal No. 413, *Stephen Sachs* and *Charles Morgan* for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Daniel W. Moylan, State's Attorney for Washington County,*

and *Arthur Rozes, Assistant State's Attorney for Washington County,* on the brief, for appellee.

In appeal No. 464, *Joseph F. Padula* for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with no brief filed on behalf of appellee.

In appeal No. 629, *Joseph F. Padula* for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Gilbert Rosenthal, Assistant Attorney General, Daniel W. Moylan, State's Attorney for Washington County,* and *Arthur Rozes, Assistant State's Attorney for Washington County,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

The disorders occurring at the Maryland Correctional Institution, Hagerstown, Maryland, on May 17, 1971, led to the indictment of a number of inmates on varying charges, including assault, riot, and malicious destruction of property. Many of those charged filed a suggestion of removal, Md. Rules 542 and 738, under affidavit,[1] in which they alleged that they could not receive a fair and impartial trial in Washington County, Maryland. They requested removal of the trial of their cases to the Criminal Court of Baltimore.[2] The motion was argued before Judge Paul W. Ottinger on February 10, 1972. The memorandum in support of the motion that was submitted to Judge Ottinger contended that Art. IV, § 8 of the Maryland Constitution is violative of the Constitu-

---

1. Actually, only the appellant Austin has his petition under affidavit, but by agreement of counsel and with the apparent acquiescence of the trial court, the petition relative to each movant was deemed to have been notarized. We treat them as such.

2. A defendant does not have the right to designate the jurisdiction to which a case shall be removed. *Marzullo v. Kovens Furniture Co.,* 253 Md. 274, 252 A. 2d 822 (1969); *Lee v. State,* 161 Md. 430, 157 A. 723 (1931); *De Murgiondo v. Frazier,* 63 Md. 94 (1885); *Weiskittle v. State, ex rel. Samuel,* 58 Md. 155 (1882); *Brown v. Pepersack,* 217 F. Supp. 547 (D. Md. 1963).

tion of the United States, in that the failure to grant removal as a matter of right in non-capital criminal cases, while granting it in capital cases, amounts to a denial of equal protection under the Fourteenth Amendment. The movants also averred that the "prejudicial atmosphere" that existed in the community, hardened by the pretrial publicity, had such a deleterious effect as to deprive them of their right to a fair and impartial trial. The movants additionally claimed that the "prejudicial atmosphere is heightened and exaggerated" because of their status as "alien figures in Washington County." The "alien figure" argument is grounded upon the homogeneous nature of the county where the racial composition of the population, according to appellants, is 98% white persons and 2% black persons, and upon their status as prisoners involuntarily placed in the County.

To buttress their contention regarding pretrial publicity, the movants presented to the court a series of newspaper articles.[3] Judge Ottinger denied the sugges-

---

3. We summarize the articles as follows:

*Morning Herald*, May 18, 1971, page 1; headline, "Short-lived disorder sweeps MCI"

*Morning Herald*, May 19, 1971, no page number, "8 inmates face discipline board"

*Morning Herald*, May 21, 1971, no page number, "Inmates allegedly beaten MCI probe ordered"

*Morning Herald*, May 22, 1971, page 1; headline, "Prison union threatens walkout"

*Morning Herald*, June 11, 1971, page 1; headline, "Five men found guilty of rioting at MCI last October"

*Morning Herald*, July 21, 1971, no page given; "Decision To Come Later On MCI Guard Discipline"

*Morning Herald*, October 6, 1971, no page given; "Suspended guards returning to MCI"

*Daily Herald*, May 18, 1971, page 1; "Ringleaders In MCI Disorder Held In Isolation"

*Daily Herald*, May 22, 1971, no page number; "Guards Threaten Walkout"

*Daily Herald*, June 24, 1971, no page number; "30 Arraigned In Court In Drug Violation Cases"

*The Daily Mail*, May 19, 1971, no page number; "MCI Conducts Hearings On Prison Disorder"

*The Daily Mail*, May 20, 1971, no page number; "18 MCI Inmates Transferred to Other Prisons"

*The Daily Mail*, May 21, 1971, no page number; "Investigation Ordered By Mandel Of Charges Of Brutality At MCI"

tion of removal and, in a memorandum filed February 22, 1972, stated:

> "The Court finds that the Defendants in these cases can have a fair and impartial trial in the Circuit Court for Washington County and that the Defendants . . . have failed to make it satisfactorily appear to the Court that such suggestion is true and that there is (sic) reasonable grounds for the same.
>
> The alleged riotous conduct in this case apparently lasted less than an hour and the publicity attendant thereto does not appear to have been substantial. . . . Moreover, the publicity last (sic) for a day or two only and such publicity happened about nine months ago and it seems doubtful to the Court that any prospective juror would remember in detail the short term publicity which resulted from this incident.
>
> The Court is also not satisfied that it would be impossible for any harm done by such publicity to be exposed by a voir dire examination of prospective jurors; and the Court does find that such a voir dire examination would be a sufficient protection in these cases."

The record before us in appeal #413, Henry Gibson, leaves much to be desired as there is no *voir dire* examination reported therein. Consequently, we are unable to evaluate the *voir dire* for the presence or the possibility of actual prejudice on the part of the talesmen. The

---

*The Daily Mail*, September 2, 1971, no page number; "Six MCI Guards Face Threat Of Dismissal"

*The New York Times*, September 10, 1971, no page number; "Attica Has No Fear, but Anger Aplenty"

*Baltimore Morning Sun*, September 15, 1971, no page number; "A Prison Does Things To The Town At Its Gates"

*Baltimore Morning Sun*, September 22, 1971, no page number; "Ex-Con Calls Hagerstown Potential Attica"

*Baltimore Morning Sun*, October 7, 1971, no page number; "Detention site set in Hagerstown area"

record in appeal #629, Robert T. Austin, does, however, contain "Voir Dire Requests" made by Austin's then counsel. Handwritten on the bottom of the "Requests" is the notation "all questions asked." There is no contention here that the questions were not asked, and we assume that they were actually propounded to the jury panel. The questions are obviously designed to disclose prejudices, including those founded on pretrial publicity and race. The record is silent as to the answers to the *voir dire* interrogation as apparently no transcript was made. While in Austin's case we possess the questions and the belief that they were asked, we are no better off insofar as evaluating prejudice, or the possibility of prejudice resulting from pretrial publicity, than we are in the Gibson appeal.

Gibson [4] and Austin [5] were convicted in separate jury trials, and Tate [6] was convicted in a non-jury trial.

## I

In their appeals to this Court, appellants jointly attack Art. IV, § 8 of the Maryland Constitution on the ground that it creates constitutionally impermissive classifications for removal in criminal cases, *i.e.*, capital crimes and non-capital crimes, and thereby denies the appellants equal protection of the law. They further assail the trial judge's ruling on their "Suggestion for Removal" as an abuse of discretion. They assert that they could

---

4. Henry Gibson was indicted for two charges of assault, one charge of riot and one charge of malicious destruction of property. A judgment of acquittal was granted as to the malicious destruction of property charge. Appellant was convicted on the other charges and sentenced to terms of 1 year, 4 years, and 1 year, respectively. Each sentence is to be served consecutive to each other and consecutive to the sentence the appellant was serving at the time of the trial.

5. Robert T. Austin was indicted and convicted of riot. He was sentenced to an "Indeterminate period not to exceed ONE (1) year." The sentence is to be served consecutively to the sentence appellant was serving at the time of the trial.

6. John E. Tate was indicted and convicted of assault. He was sentenced to an "Indeterminate period not to exceed TWO (2) years." The sentence is to be served consecutively to the sentence the appellant was serving at the time of the trial.

not receive a fair and impartial trial in Washington County as a result of pretrial publicity, racial prejudice and the "prejudicial atmosphere." The fact that Tate later chose a non-jury trial does not preclude his arguing against the trial judge's denial of the suggestion for removal that was filed and denied well before his trial.

Since 1806 Maryland has vacillated between the absolute right of removal in all cases and the discretionary right of removal in non-capital cases. There appears to be no mention of a change of venue in the Constitution of 1776, but that Constitution was amended in 1806 so as to grant to the trial courts the discretionary right to remove all criminal cases upon suggestion that an accused could not receive a fair and impartial trial. In 1851 the State Constitution was again changed, and the absolute right of removal was given in every criminal case. Because it was felt that the privilege of removal was being abused, the Constitutional Convention of 1864 returned the removal of cases to the discretion of the trial judge. Three years later the absolute right to remove was restored in the Constitution. In 1874 it was again felt that the right of removal was being abused so that the Legislature proposed an amendment to the Constitution of 1867, limiting the absolute right of removal to those cases in which the death penalty could be imposed. The proposed amendment was adopted by the voters in 1875 and has continued unchanged since that time in spite of an abortive attempt in 1952 to change it by statute. *See* Ch. 69 [1952] Md. Laws. The statute was declared unconstitutional in *Heslop v. State,* 202 Md. 123, 95 A. 2d 880 (1953).

During oral argument before this Court, the appellants sought to inject a new ingredient not raised below in order to support their position. They maintained that the allowance of removal as an absolute right in most civil cases, and only as a discretionary right in non-capital criminal cases, denies them equal protection. We do not consider that argument because it was not raised below.

Rule 1085. Even constitutional questions must be raised and decided in the trial court. *Richardson v. State,* 14 Md. App. 487, 287 A. 2d 339 (1972) ; *Brooks v. State,* 13 Md. App. 151, 282 A. 2d 516 (1971) ; *Woodell v. State,* 2 Md. App. 433, 234 A. 2d 890 (1967).

We limit our discussion to the argument that Art. IV, § 8 of the Maryland Constitution creates an invidious distinction between capital and non-capital criminal cases. Art. IV, § 8 provides in pertinent part:

> ". . . [I]n all cases of Presentments or indictments for offences, which are or may be punishable by death, pending in any of the courts of law in this State having jurisdiction thereof upon suggestion in writing under oath of either of the parties to said proceedings that such party cannot have a fair and impartial trial in the court in which the same may be pending, the said court shall order and direct the record of proceedings in such suit or action, issue presentment, or indictment, to be transmitted to some other court having jurisdiction in such case for trial, but in all other cases of presentment or indictment, pending in any of the Courts of law in this State having jurisdiction thereof, in addition to the suggestion in writing of either of the parties to such presentment or indictment that such party cannot have a fair and impartial trial in the court in which the same may be pending, it shall be necessary for the party making such suggestion to make it satisfactorily appear to the court that such suggestion is true, or that there is reasonable ground for the same, And thereupon the said court shall order and direct the record of proceedings in such presentment or indictment to be transmitted to some other court having jurisdiction in such cases for trial. . . ."

The procedures for placing into effect the rights granted under Art. IV, § 8 are contained in Maryland Rules 542 and 738.

The portion of Art. IV, § 8 concerned with capital crimes has been negated, at least at this time, by *Furman v. Georgia,* 408 U. S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972), and *Bartholomey v. State,* 267 Md. 175, 297 A. 2d 696 (1972). This Court has interpreted the rulings in those cases to abolish effectually the death penalty in Maryland. *McLaughlin v. Warden,* 16 Md. App. 451, 298 A. 2d 201 (1973). In the instant case, however, we shall look to the law as it existed when Judge Ottinger decided the removal issue prior to the *Furman, Bartholomey* and *McLaughlin* decisions.

Our perusal of the case law convinces us that there is nothing about Art. IV, § 8 of the Maryland Constitution that is violative of the United States Constitution. We think that a legislative body or, in this State, the voters, can create a reasonable distinction between capital and non-capital criminal offenses for the purpose of granting an absolute right to a change of venue. The history of our constitutional removal provision is indicative of our ancestors' attempt to provide an absolute right of removal in all criminal cases but that the effort led to such abuse that the unqualified right of removal in all cases was rejected by the people in 1875. A number of jurisdictions adopt a similar view. *See* 34 A.L.R.3d 804-808.

The Supreme Court, in *Groppi v. Wisconsin,* 400 U. S. 505, 91 S. Ct. 490, 27 L.Ed.2d 571 (1971), considered a situation wherein Father Groppi, a Roman Catholic priest, was apprehended in Milwaukee, Wisconsin, on a charge of resisting arrest. Under the Wisconsin law that offense is a misdemeanor punishable by a fine of not more than $500.00 or imprisonment for not more than one year, or both. The arrest of Father Groppi occurred on August 31, 1967, and after a series of continuances, he was brought to trial before a jury on February 8,

1968. He quickly exhausted his peremptory challenges in an endeavor to qualify the jury. Prior to trial he had filed a motion for a change of venue on the ground that he could not receive a fair and impartial trial in Milwaukee County. The motion was denied because "Wisconsin law did not permit a change of venue in misdemeanor cases." Groppi was convicted and the Supreme Court of Wisconsin, with two of its members dissenting, affirmed the judgment. The dissenters argued that the Wisconsin statute "did not absolutely forbid a change of venue in a misdemeanor prosecution, and that if the statute did contain such a prohibition it was constitutionally invalid." The Supreme Court, speaking through Mr. Justice Stewart, said at 511:

> "It is doubtless true, as the Supreme Court of Wisconsin said, that community prejudice is not often aroused against a man accused only of a misdemeanor. *But under the Constitution a defendant must be given an opportunity to show that a change of venue is required in his case.* The Wisconsin statute wholly denied that opportunity to the appellant." (Emphasis supplied).

Six justices constituted the majority, two concurred, and one dissented.[7] The Wisconsin statute, then in effect,[8]

---

7. Justice Blackmun wrote a concurring opinion in which the Chief Justice joined. Justice Blackmun's opinion was directed toward "whether the appellant . . . received a fair trial, not whether, as a matter of abstract constitutional law, [Groppi] was entitled to a change of venue. . . ."
Mr. Justice Black dissented and said in part:
> "But it simply cannot be said that the right to trial by an impartial jury must necessarily include a right to change of venue. It may or may not be wiser to implement the Sixth Amendment by a change of venue provision, but in my view, the Constitution does not require it . . . ."
> * * *
> ". . . So long as a defendant can protect his Sixth Amendment right by a motion for a new trial, I see no constitutional infirmity in the Wisconsin statute."

8. Wisconsin statute, § 971.22, effective July 1, 1970, now permits a change of venue in all criminal cases in the discretion of the court.

allowed, in the discretion of the court, removal of felony cases only, to any county where an impartial jury trial could be had.

We think it patent in the Supreme Court's ruling in *Groppi* that where a statute or constitution provides the "opportunity to show that a change of venue is required," the rights of an accused are adequately safeguarded, and he is afforded the full protection required by the Fourteenth Amendment.

In *Johnson v. Louisiana,* 406 U. S. 356, 92 S. Ct. 1620, 32 L.Ed.2d 152 (1972), the Supreme Court upheld the constitutionality of the provisions of a Louisiana law requiring less than unanimous jury verdicts in criminal cases. Johnson had been tried and convicted of the offense of robbery. The jury vote was 9 to 3. Louisiana law provides[9] that in those offenses for which sentence to imprisonment at hard labor must be imposed, an accused shall be tried before a jury of 12, nine of whom must concur to render a verdict. Those cases in which capital punishment may be imposed shall be tried before a 12 person jury, all of whom must concur in the verdict, and those offenses for which imprisonment at hard labor may be imposed shall be tried before a jury of 5 persons, all of whom must agree in order to render a verdict. The Louisiana Supreme Court affirmed Johnson's conviction, and in doing so rejected his contention that the jury trial provisions of Louisiana law were violative of due process and equal protection. The Supreme Court of the United States, by a vote of 5 to 4, affirmed the judgment of the Louisiana courts.

Mr. Justice White, speaking for the majority, said that a law allowing a less than unanimous jury verdict raised "no question of constitutional substance about either the integrity or the accuracy of the jury's verdict," and that the Louisiana jury trial procedure did not deny Johnson due process of law. Justice White further stated:

9. La. Const. Art. VII, § 41, and La. Code Crim. Proc. Art. 782.

"We conclude, however, that the Louisiana statutory scheme serves a rational purpose and is not subject to constitutional challenge.

In order to 'facilitate, expedite, and reduce expense in the administration of criminal justice, 'State v. Lewis, 129 La. 800, 804, 56 So. 893, 894 (1911), Louisiana has permitted less serious crimes to be tried by five jurors with unanimous verdicts, more serious crimes have required the assent of nine of 12 jurors, and for the most serious crimes a unanimous verdict of 12 jurors is stipulated. . . . We discern nothing invidious in this classification. . . .

Appellant nevertheless insists that dispensing with unanimity in his case disadvantaged him as compared with those who commit less serious or capital crimes. With respect to the latter, he is correct; the State does make conviction more difficult by requiring the assent of all 12 jurors. Appellant might well have been ultimately acquitted had he committed a capital offense. But as we have indicated, this does not constitute a denial of equal protection of the law; the State may treat capital offenders differently without violating the constitutional rights of those charged with lesser crimes. . . . We remain unconvinced by anything appellant has presented that this legislative judgment was defective in any constitutional sense."

We believe that the rationale of *Johnson* is applicable to the case at bar. There is nothing invidious in the Maryland constitutional distinction between removal in capital and non-capital criminal offenses. The distinction serves as a means of preventing an abuse of removal and thereby facilitates, expedites, and reduces expense in the administration of criminal justice. That Maryland chooses to "treat capital offenders differently" does not violate "the constitutional rights" of those charged with non-capital offenses.

We turn now to the appellants' other removal contentions—pretrial publicity, racial prejudice and general prejudicial atmosphere. Appellants argue that the pretrial publicity was of such a nature that they could not obtain a fair and impartial trial in Washington County. We observe that the last newspaper article published in Washington County that is found in the records before us was an item that appeared in the *Morning Herald* of October 6, 1971, in which it was stated that six suspended guards from the Maryland Correctional Institution were returning to their positions while awaiting hearings. The exhibit of most recent date,[10] in the records, is an article found in *The Baltimore Morning Sun* of October 7, 1971. It deals with a proposed detention center near Hagerstown and does not, directly or indirectly, reflect on the incident giving rise to the instant cases. There was a lapse of approximately 6½ months from the date of the last newspaper article until the date of trial, and a period of approximately one year passed from the date of the disturbance at the institution to the trial date.

In these cases the records disclose the following dates: offense: May 17, 1971; indictments: June 14, 1971; service of process: June 21, 1971; arraignments: June 24, 1971; suggestion for removal: January 21, 1972; order denying removal: February 22, 1972; and date of trials: May 18, 1972 (Gibson), May 19, 1972 (Austin) and April 13, 1972 (Tate).

This Court, in *Raimondi v. State*, 12 Md. App. 322, 278 A. 2d 664 (1971), *aff'd* 265 Md. 229, 288 A. 2d 882 (1972), *cert. denied* 409 U. S. 948, 93 S. Ct. 293, 34 L.Ed.2d 219 (1972) [12 C.R.L. 4044], said at 339-440:

"Unlike *Sheppard v. Maxwell*, 384 U. S. 333, 86 S. Ct. 1507, 16 L.Ed.2d 600, or *Estes v. Texas*, 381 U. S. 532, 85 S. Ct. 1628, 14 L.Ed.2d 543, we do not here see inherent prejudice from publicity which saturated the community. Although appellant claims that it will be impos-

10. See note 3, *supra*.

sible for him to have a fair trial 'in a foreseeable future', we will not so readily assume that an unbiased trier of fact cannot be found, *Grammer v. State,* 203 Md. 200, 100 A. 2d 257, *cert. den.* 347 U. S. 938, 74 S. Ct. 634, 98 L. Ed. 1088, especially since as a practical matter trials cannot be held in a vacuum hermetically sealed against rumor or report. . . .

The trial in this case was only after a lengthy hiatus between the indictment and the trial. The hiatus was 16 months as opposed to significantly shorter periods in *James v. State,* 193 Md. 31, 65 A. 2d 888 (arraigned July 13, 1948, tried September 20, 1948, *Baltimore Radio Show v. State,* 193 Md. 300, 67 A. 2d 497) or *Grammer v. State, supra,* (arraigned September 16, 1952, tried October 14, 1952)."

*See also Cleveland v. State,* 12 Md. App. 712, 280 A. 2d 520 (1971).

We do not think that the appellants have demonstrated successfully that the pretrial publicity was of such intensity that it permeated the community to the extent that the appellants were denied their right to a fair and impartial jury trial as mandated by both the Sixth Amendment to the Constitution of the United States and Art. 21, Maryland Declaration of Rights.

Appellants' next attack on the denial of the suggestion for removal is directed to the question of alleged racial prejudice and prejudicial atmosphere supposedly existing in Washington County. Appellants aver that the trial judge did not answer these allegations. Appellants characterize the atmosphere in the county as "prejudicial," as well as "heightened and exaggerated by their inescapable status as alien figures." Their attack is based primarily on the racial composition of Washington County, the penal institution, and the correctional personnel of the institution. Neither a bare showing that the county population is 2% black, that the prison in-

mates are 75% black, and that all but one of 147 correctional officers are white, nor a naked allegation that the appellants were "aliens," *per se* substantiates the appellants' averment that they were denied the right to a fair and impartial trial. *Maryland v. Brown,* 295 F. Supp. 63 (D. Md. 1969).

While Judge Ottinger did not explicitly delineate each area of contention raised by appellants, we note that he said that the appellants had "failed to make it satisfactorily appear to the Court that such suggestion [of removal] is true and that there is reasonable grounds for the same." We construe such a finding to include within its ambit a disposition of each of the appellants' allegations.

The Court of Appeals and this Court have consistently held that the question of whether or not a removal shall be granted in a non-capital criminal case rests within the sound discretion of the trial judge, subject, however, to a review of the exercise of that discretion by an appellate court. *Seidman v. State,* 230 Md. 305, 187 A. 2d 109 (1962) ; *McGowan v. State,* 220 Md. 117, 161 A. 2d 156 (1959) ; *Piracci v. State,* 207 Md. 499, 115 A. 2d 262 (1955) ; *Allers v. State,* 144 Md. 75, 124 A. 2d 399 (1923) ; *Smith v. State,* 16 Md. App. 317, 295 A. 2d 802 (1972) ; *Cleveland v. State, supra; Stevenson v. State,* 9 Md. App. 152, 262 A. 2d 36 (1970) ; *McLaughlin v. State,* 3 Md. App. 515, 240 A. 2d 298 (1968). We observe no abuse of discretion in denying the appellants' request for removal.

## II

The appellant Tate presented no other issues to this Court. Gibson raised the additional contention that his rights were denied under Md. Ann. Code Art. 27, § 616 S —The Intrastate Detainer Act.

We reject appellant Gibson's argument summarily. The detainer act is not applicable. There is no evidence that a detainer was ever filed against Gibson or that the

Warden of the Maryland State Penitentiary, where Gibson was confined at the time of the indictment, had knowledge of the indictment. Likewise, there is nothing in the record to indicate that Gibson had not been informed of his rights by the warden or some other prison official. Moreover, in *King v. State*, 5 Md. App. 652, 662, 249 A. 2d 468 (1969), we held that:

> ". . . the [Detainer] Act is not invoked if the warden fails to inform the prisoner as required either because he has not received knowledge of a detainer . . . or having received such knowledge fails to inform the prisoner."

*See also Carter v. State*, 15 Md. App. 242, 289 A. 2d 837 (1972). Appellant Gibson's contention is devoid of merit.

Appellant Austin raises the further issue that the evidence presented by the State was legally insufficient to sustain a conviction of riot. In *Cohen v. State*, 173 Md. 216, 195 A. 532 (1937), *cert. denied* 303 U. S. 660, 58 S. Ct. 764, 82 L. Ed. 1119, the Court of Appeals quoted with approval from *Commonwealth v. Berry*, 5 Gray (71 Mass.) 93, wherein it is stated:

> "It is undoubtedly true that a riot cannot ordinarily be committed by one person. It is the acting in concert, the unlawful combination, which constitutes the offense. . . . Whether the other rioters were named in the indictment, or not, proof of a riot in which any two other persons joined with the defendant was sufficient."

*See also Briscoe v. State*, 3 Md. App. 462, 240 A. 2d 109 (1968). The common law offense of riot was defined in *Briscoe*, quoting from 77 C.J.S. *Riot*, § 6, p. 426 as:

> ". . . the intent to join in or encourage the acts which constitute the riot, namely, the assembly, violence, turbulence, and the act violently and turbulently performed."

The transcript in the Austin case reveals that Correctional Officer Robert Schaub and Correctional Officer Robert Lewis were led by two inmates, one carrying a club and one having a ring of keys, into the "Rec Room" where the officers were placed with their backs against the wall. At that time there were approximately forty or fifty inmates in the "Rec Room" upsetting tables and benches and setting up barricades. The two officers were placed with two other officers, one of whom was shortly thereafter taken away by an inmate for first aid treatment. The appellant, with a club in hand, approached the remaining three officers and drew the club back three times as if to strike the officers. An identified inmate who had led the second two officers into the "Rec Room" intervened and made some comments to the appellant. Appellant then commenced running back and forth through the "Rec Room." The officers lost sight of him. The officers testified that they were placed in fear because of appellant's actions with the club at the time he approached them.

The test for the sufficiency of the evidence, in a jury trial, is whether the evidence, if believed, either shows directly or supports a rational inference of the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt. *Conway v. State*, 15 Md. App. 198, 289 A. 2d 862 (1972); *Young v. State*, 14 Md. App. 538, 288 A. 2d 198 (1972); *Williams v. State*, 5 Md. App. 450, 247 A. 2d 731 (1968).

We think that from the evidence adduced in this case the jury could have been fairly convinced, beyond a reasonable doubt, that the appellant acted in concert with at least two other inmates to assemble and act violently, turbulently, and in such a manner as to constitute riot. The jury was under no obligation to believe the appellant's testimony that he was carrying the club for his own protection from fellow inmates. *James v. State*, 14 Md. App. 689, 288 A. 2d 644 (1972); *Sabatini v. State*, 14 Md. App. 431, 287 A. 2d 511 (1972); *Derricks and*

*Hilgeman v. State*, 9 Md. App. 261, 263 A. 2d 597 (1970).

*Judgments affirmed.*