MICHAEL SEAN GARLAND *v.*
STATE OF MARYLAND

[No. 876 (On Remand), September Term, 1974.]

*Decided December 28, 1976.*

The cause was argued before ORTH, C. J., and MOYLAN and GILBERT, JJ.

*William H. Murphy, Jr.,* for appellant.

*Alexander L. Cummings, Assistant Attorney General,*

with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Joseph F. Lyons, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Michael Sean Garland, was orginally indicted by the Baltimore City Grand Jury for murder and for the unlawful use of a handgun. At the suggestion of the State and over the vigorous objection of the appellant, the case was removed from Baltimore City to the Circuit Court for Montgomery County for trial. In the Circuit Court for Montgomery County in a jury trial, presided over by Judge Ralph G. Shure, the appellant was convicted of murder in the second degree and of the handgun violation. Upon appeal to this Court, the appellant raised initially ten contentions, the present cataloging of which is unnecessary. Following the argument in this Court but before a decision was handed down, the appellant moved for reargument because of the alleged pertinence of the then recently decided case of *Mullaney v. Wilbur,* 421 U. S. 684, which decision was handed down by the Supreme Court of the United States on June 9, 1975. Agreeing that the principles enunciated in *Mullaney v. Wilbur* were, indeed, pertinent, we granted the motion for reargument.

In our decision in *Garland v. State,* 29 Md. App. 27, we reversed the conviction because of our belief that the appellant had been denied due process of law because of a jury instruction which arguably placed upon him the burden of lowering his degree of blameworthiness from the murder level to the manslaughter level. Upon appeal by the State, the Court of Appeals in *State v. Garland,* 278 Md. 212, reversed our judgment essentially on factual grounds, concluding that the instruction taken as a whole did not operate to shift unconstitutionally a burden of persuasion to the appellant, albeit certain portions of the instruction were inartfully phrased according to the hindsight of *Mullaney v. Wilbur.* The Court of Appeals remanded the case to us for

260

further consideration of the other contentions raised by the appellant.

It is only necessary for us to come to grips with one of them: the claim by the appellant that he was denied the equal protection of the law when his case was removed from Baltimore City to Montgomery County.

The case was fraught with racial overtones. The appellant, a black man, shot and killed a white policeman, Officer Norman Buchman, on April 6, 1973. The appellant shot Officer Buchman in the head six times in rapid succession with the officer's own service revolver. Immediately preceding the shooting, both the appellant and the victim had been fighting and rolling to the ground outside the appellant's mother's home on Quantico Avenue in Baltimore City. There was evidence, from the appellant and others, that Officer Buchman had engaged in a pattern of harassment directed toward the appellant since the beginning of March, repeatedly following him, stopping him, arresting him, impounding the appellant's new car and treating him in a rude and contemptuous manner. There was, as we pointed out in *Garland v. State*, 29 Md. App. 27, 28, a genuine jury question in this regard:

> "The critical defensive issue in this case was mitigation in that the appellant allegedly killed his victim in a hot-blooded response to legally adequate provocation, to wit, in the course of mutual combat. Without detailing the long and involved factual picture, it is enough to point out that the evidence, both from the State's case and the defense case, was enough to generate a genuine jury issue on the subject of mitigation due to provocation."

This case involved non-capital charges and therefore the decision on removal rested in the sound discretion of the trial judge and will not be reversed absent a showing that that discretion was abused. *Gibson v. State*, 17 Md. App. 246; *Smith v. State*, 16 Md. App. 317; *Stevenson v. State*, 9 Md. App. 152; *McLaughlin v. State*, 3 Md. App. 515; *Benton v. State*, 1 Md. App. 647. In looking to the question which the

hearing judge must decide, however, it is clear that the State must allege in writing and under oath that it cannot receive a fair and impartial trial. Furthermore, "It shall be necessary for the party making such suggestion to make it sastifactorily appear to the court that such suggestion is true, or that there is reasonable ground for the same." Maryland Constitution, Article IV, § 8. And see *Mason v. State*, 12 Md. App. 655. The moving party in this case was the State of Maryland. The appellant vigorously opposed the suggestion of removal.

We conclude that the State failed to carry its burden "to make it satisfactorily appear to the court" that it could not receive a fair and impartial trial in the City of Baltimore. The State supported the suggestion by filing some twenty-eight exhibits. At initial glance, the mass of exhibits is impressive. Upon more thorough examination, however, a full 95 percent of the allegedly prejudicial pretrial publicity is revealed to be immaterial to the issue upon which it is offered. We note initially that the State alleged in its Suggestion for Removal "that neither the State nor the Defendant can have a fair and impartial trial in this Court." It is not the prerogative of the State, however, to assert the rights of the appellant. As far as any impact upon the appellant was concerned, the appellant concluded that he could receive a fair trial in Baltimore City and made no move whatsoever to have his case removed. Indeed, he opposed the move. We will, therefore, look to the supporting evidence for the only material issue raised by the State — that it (the State) could not receive a fair trial. Most of the exhibits filed by the State would have been very relevant if they had been filed by the appellant upon his own motion for removal. Those things which might tend to show that the appellant could not receive a fair trial, however, do not tend to show that the State could not receive a fair trial. We believe that the unduly broad brushstrokes used by the State may have lured the eminently fair and impartial jurist, who ordered the removal, into a false sense of solicitude for the appellant, which solicitude the appellant was not seeking and did not wish.

The shooting occurred on April 6. There was significant, but not excessive, press coverage during the period of April 6 to April 10. Several radio stations and several television stations briefly reported the killing of the policeman. A few newspaper articles appeared — in *The Morning Sun,* in *The Evening Sun,* in *The News-American* and in *The Afro-American.* Except for a banner headline on one occasion in *The News-American,* the articles were of moderate tone and length and were not particularly prominently displayed. The only basis for the State's claim that it could not receive a fair trial was the fact that the defense attorney, shortly after the appellant's arrest, claimed that his client had been beaten by the police and predicted that they would extract a confession from him. The total coverage on this claim in all of the stories in all of the media consisted of no more than a few paragraphs. Indeed, the great bulk of the pretrial publicity, during its several days of relative prominence, militated strongly in favor of the State and not against it. The banner headline in *The News-American* and the lead paragraphs of most of the stories featured the fact that the appellant had shot and killed a policeman. The only photographs were of the slain policeman, his widow and orphaned daughter. The Fraternal Order of Police called for a crackdown on police killers. Governor Mandel called for a reinstitution of the death penalty in view of the police killing. Civic watchdog Hyman Pressman called for an investigation as to why judges are "soft" on police killers. Some of the stories made much of the prior criminal record of the appellant. Some made much of the hospital examination which tended strongly to negate his claims of having suffered physical harm at the hands of the police. All of this might well have supported his suggestion for removal, had he made one. The State, however, may not beef up its own case or obscure its lack of a case by making a case for the opposing party.

The publicity had entirely run its course by April 10. The hearing was not held until November 19. The State did point out one arguable flurry of renewed publicity in early September in conjunction with Fallen Heroes Day. This,

however, was a civic memorial for all policemen and firemen who had died in the line of duty. Included were some mentions of the slain Officer Buchman. In this context, however, the entire thrust of the mentions was by way of eulogizing the slain officer. This brief flurry of renewed publicity could only have enhanced the prosecution's chances of success, not injured them.

The amount of demonstrated pretrial publicity that arguably worked against the interests of the State was minimal. It was already seven months into the past at the time of the hearing on the question of removal. There was no indication whatsoever that voir dire examination could not easily have factored out any potential jurors who had any conceivable knowledge of the case.

Although we are confident that the hearing judge himself made every effort to be preeminently fair to both sides, we think he was lured into error by the overly broad allegations and the overly broad supporting data of the State. They beefed up their own claim by making a claim on behalf of the appellant which it was not the State's prerogative to make. They camouflaged their own lack of any substantial evidence of pretrial publicity running against their interests by surrounding it with substantial evidence of pretrial publicity running against the interests of the appellant, which evidence was, of course, irrelevant to the State's claim. It is, moreover, clear that the issue of pretrial publicity was, at least subconsciously, a smoke screen for what really was at stake. It was clear that the trial of the case would be heavy with racial overtones. The hearing judge very candidly and perceptively pinpointed the problem:

> "In the selection of a jury for the trial of a racially charged case, such as is present in the instant case, no one who is even remotely familiar with the trials of such cases in Baltimore City will dispute the accepted fact that these jurors will be chosen primarily because of the color of their skin. This blunt statement is distressingly true. Instead of having a jury representing a fair cross section of

the city, therefore, the probable jury in this case, if it is tried in Baltimore City, will be oriented, subtly or otherwise, toward the underlying tragic issue of racial appeal. Thus, it would be anything but a fair cross section of the city."

The State was, in the last analysis, not concerned with potential jurors who had been tainted by pretrial publicity. Not simply was the bulk of that taint unmistakably in favor of the State, but such a handful of potential jurors, if there had been any at all, could easily have been screened out by voir dire examination. What was really at stake was the ultimate racial composition of the jury regardless of whether there had or had not been any pretrial publicity. The unspoken premise which underlies the State's case is that a black juror would be unfairly sympathetic to a black defendant charged with killing a white policeman under circumstances where his defense was that he had been incensed by harassment into a hot-blooded killing in immediate response to legally adequate provocation, thereby lowering the degree of blameworthiness to the level of manslaughter. Such a proposition is totally unacceptable to our jurisprudence. If it could be claimed that a black juror would be unduly sympathetic to such a defense, it could be claimed with equal validity that a white juror would be unfairly unsympathetic to such a defense. Yet the ultimate racial composition of the jury, whether tainted or untainted by pretrial publicity, appeared to be the issue at stake. We notice evidence of this concern in the remarks about the imbalance in the allocation of peremptory strikes:

"Maryland Rule 746 provides that, in the trial of all criminal cases involving imprisonment of twenty years or more, each defendant is permitted twenty peremptory challenges, while the State is permitted only ten peremptory challenges for each defendant. No one has ever advanced a logical explanation for this mysteriously unbalanced allocation of challenges. It is difficult to understand why, for example, if one person attempts to murder

another person, and his aim is faulty and he does not kill his victim but merely cripples or maims him for life, the State and that person are each allowed four peremptory jury challenges; however, if he has superior marksmanship and kills his victim, he is allowed twenty such challenges to ten for the State.

. . .

The decisive test, in the opinion of this Court, is whether removal should be granted if the provisions of Maryland Rule 746 were reversed — this is, if the State should be allowed twenty challenges and the defendant ten. To pose the question is to answer it. Without hesitation, removal should be granted any defendant faced with such a challenge handicap."

There is no relationship between the issue of pretrial publicity and the use of peremptory challenges. Had a prospective juror been exposed to pretrial publicity, he might be struck for cause. Peremptories would not even be employed until the panel had been screened of any who had been exposed to incurable pretrial publicity. Peremptories are used to mold and to manipulate the composition of the ultimate jury from the pool of those untainted by pretrial publicity. The fact that the State had ten peremptory challenges and that the appellant had twenty was immaterial to the issue of unfair pretrial publicity. The very reference to a so-called "challenge handicap" unmistakably points to the ultimate selection process and not to the threshold process of obtaining an untainted panel from which to select.

Although we attribute no ignoble motives to the State, the unspoken assumption of the State's position is that it feared not so much prospective jurors who had *prejudged* the case in a manner sympathetic to the defense but rather that it feared a jury, albeit free of *prejudgment,* which would *judge* the case in a manner sympathetic to the defense upon the evidence adduced at the trial. To the extent to which there

were racial overtones resonating through the case, the racial overtones were of a general character, geographically speaking, and were not of some local and parochial significance peculiar to Baltimore City. The unavoidable implication of the State's position is that Baltimore, as a forum to try the case, was not unique because its black jurors, in a general sense, might be more sympathetic to the defense than would black jurors in other parts of the State, but rather that, as a demographic reality, a significantly heavier percentage of prospective black jurors would be upon the jury panels in Baltimore.

If there were any validity to the unspoken assumption that black jurors as a group might be more inclined to believe and/or to understand and/or to sympathize with the defense theory of mitigation because of police harassment (we attribute no validity to the assumption at all), the notion that there is a fundamental value in having, at least representatively, such an audience is the democratizing rationale that underlies the very institution of trial by jury — the judgment of one's peers. Demographically speaking, the "peer group" must be a randomly selected sample of a particular community as it is. Beyond the tactical use of peremptory challenges, which the law in its wisdom has allocated to the respective parties, neither the State nor the defense may manipulate the composition of that ultimate "peer group" either within the community or by removing the case from the community.

The State did not adequately show that this case had been *prejudged* adversely to its interests. It may not show, on the basis of the racial composition of Baltimore City and the so-called "challenge handicap," that it would be *judged* adversely to its interests.

> *Judgments reversed; case remanded to the Circuit Court for Montgomery County for return to Baltimore City for retrial; costs to be paid by Mayor and City Council of Baltimore.*